862 So.2d 756 (2003)
Raymond BAUGH, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 2D02-2758.
District Court of Appeal of Florida, Second District.
October 31, 2003.
Rehearing Denied December 22, 2003.
James Marion Moorman, Public Defender, and James T. Miller, Special Assistant *757 Public Defender, Bartow, for Appellant/Cross-Appellee.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Richard M. Fishkin, Assistant Attorney General, Tampa, for Appellee/Cross-Appellant.
CASANUEVA, Judge.
Raymond Baugh appeals from his conviction for capital sexual battery upon the seven-year-old daughter of his former girlfriend, for which he received a sentence of life in prison. The substantive evidence against him at trial consisted almost exclusively of pretrial unsworn child hearsay statements admitted pursuant to section 90.803(23), Florida Statutes (2000), which directly conflicted with the victim's in-court testimony. The question we face in this case is whether, given the child victim's in-court testimony that there was never any sexual abuse, the child's out-of-court hearsay statements alone can sustain the defendant's conviction for capital sexual battery. We hold that the prior statements alone cannot sustain the defendant's conviction. However, in this case there was some other evidence that would give rise to the inference that Mr. Baugh committed the crime of which he was accused. In light of that other corroborative evidence, we affirm Mr. Baugh's conviction.
The State has also cross-appealed the trial court's decision to instruct the jury to consider the child hearsay testimony as impeachment rather than direct evidence. Although we hold that the court erred in giving that instruction, the cross-appeal is moot in light of our decision affirming the conviction.

THE TRIAL: INCONSISTENT STATEMENTS AND CREDIBILITY
The trial of this case took place about six months after the alleged molestation. The State's first witness was the child victim, C.P., who described a time when the defendant, her mother's live-in boyfriend, came into her room and closed the door. C.P.'s mother had sent her to her room for "bugging" her while she was ordering lobsters from Publix on the phone, and the defendant, whom she referred to as her daddy or Ray, came into her room to yell at her, closing the door behind him. The door was then accidentally locked because C.P. had fiddled with it earlier.
The defendant was wearing only a towel because he had just come from the shower. After he finished yelling at her, he picked up some mice from a cage so that he could feed them to the pet snake. C.P. denied that Ray ever opened up his towel, at that moment or any other time. However, C.P. had seen some "very gross" pictures when she was snooping around in her mother's bedroom. The significance of that comment would emerge when the child hearsay statements were later admitted, because C.P. told investigators that the defendant had shown her pictures to teach her how to perform oral sex.
When her mother began knocking on the door, C.P. opened it immediately, and her mother asked her what was going on. In response C.P. told a "fib"that Ray made her suck his private"but that was not true."
The prosecutor pressed the child about why she told this fib, and C.P. maintained that she made the story up because her older brother, who did not live with them, had told her about a similar event that had happened to him when he was about eight years oldthat "a guy" (not the defendant or anyone involved in this case) made him suck the guy's private. C.P. thought of telling that lie because she wanted to get Ray in a "little, but not that much trouble," *758 because sometimes he made her mad. She thought that it took her a couple of minutes to think of this lie before she told her mother, although the prosecutor questioned why she had not previously told him that she had thought about it for a few minutes before blurting it out.
According to C.P., the repercussions of her statement to her mother were immediate. There was a lot of yelling; her mother called the police; and the defendant took some razor blades and went into the bathroom and slashed at his wrists. C.P. recalled for the prosecutor that she did not speak to the police until a day or so later, when they went to the station and talked to Detective Venero. She told the detective that "it happened," that her daddy made her suck his private. She admitted that she told the detective that she had done it with Ray twelve times previously and that white stuff came out, which tasted bad; on the stand, however, she denied that it happened and stated she did not know how it tasted, but her brother had told her about it.
The prosecutor continued to press C.P. about her motivation to lie about this event and to continue to lie about it. C.P. basically said that she knew that she would get in trouble for lying, that she did not want to get in any more trouble, and that she was afraid that the detective would tell her mother. Her mother scares her when she lies. Even though she was lying, C.P. knew the difference between a lie and the truth all along. One night when she was watching TV, however, she decided to tell her mother the truth because she thought maybe she could deal with getting in trouble. She was sad because her family had been broken apart and she thought it would help if she told the truth. C.P. also consistently insisted that she had not talked with her mother about these matters or about Ray except for the time when she decided to finally tell the truth.
Another line of inquiry pursued by the prosecutor, over defense objection, delved into some new rules C.P.'s mother had instituted for her household, most of which concerned wearing appropriate clothing and not locking doors. The inference the prosecution sought from this testimony was that C.P. would not be afraid to have the defendant back in their household because these rules would prevent a further recurrence of this behavior. C.P., however, asserted that she was not afraid of him because he had never molested her in the first place. Although likening this testimony to evidence of subsequent remedial measures prohibited in some civil contexts, the trial court admitted the evidence because it was inextricably intertwined with the credibility of each witness that the jury was going to have to evaluate.
On cross-examination the defense attorney elicited from C.P. that she had originally told the lie because she was mad at her mother and Ray for yelling at her, and she kept repeating it because she was afraid of her mother. She ultimately told the truth, though, because she was sad that her family was broken apart and she felt bad that her lie had gotten them into this situation, and, she thought, "maybe I can deal with the pressure." It was a difficult decision, one she had to think about a long time. She again recounted that the story she had heard from her brother had stuck in her mind and supplied the details. Also, in nosing around her mother's room she had come across one picture that she should not have seen, and that, too, was difficult to erase from her mind. As for the new rules, they made her feel safe, but Ray never had asked her to do anything naughty or showed her naughty pictures. She was afraid of him, though, because when he *759 does not take his medication he hurts himself. Finally, the defense elicited from C.P. that she does not like her mother's former friend, Kristin, and that she would never tell her a secret.
At the conclusion of C.P.'s testimony, the State had demonstrated that the alleged victim had first accused the defendant of molesting her, repeated that story to a number of different people, and then changed her story. C.P. was asked to identify the towel that Ray wore that night. She did so, but no physical evidence was ever obtained from that towel. The child protection team worker testified that her examination of C.P. revealed no evidence of abuse. Pornographic pictures were eventually recovered from the home, but there was never any direct testimony that the defendant had shown them to C.P. The detective, the child protection worker, and virtually every other witness repeated C.P.'s hearsay statements, but there was never any direct evidence demonstrating that events unfolded the way C.P. initially said they had.
Other than the child's prior inconsistent statements, the most damning piece of evidence was elicited from the mother. She testified that after she finished calling Publix about lobsters, she attempted to enter C.P.'s room but found that the door was locked. Within a few secondsfewer than thirty, according to her estimate someone opened the door. She saw Raymond standing there, wrapped up in his towel, with white mice in his hand, and her daughter behind him. Both denied knowing the door was locked, but she wanted to find out what had happened, so she separated them. She took C.P. to her bedroom, asked what was going on, and the child's exact words were, "He made me suck on his dick." The mother immediately confronted Ray, spouting what she described as "colorful metaphors," slapping him several times, and insisting that he leave immediately. During their heated argument Raymond said, "I want her to suck my dick, I want you to watch, and then I want to fuck you after."
C.P.'s mother testified on direct that Raymond made this remark in the heat of an argument to anger her, which it did. In fact, the first time the mother had indicated that she thought Raymond was less than serious when he made this remark, that he was describing what he wanted rather than what he did, was at the bond hearing, and by that time her daughter had changed her story and the mother was doing all she could to have Raymond released from jail.
On cross-examination the mother testified that she believed C.P. when she changed her story, because her behavior had changed for the better after she received the attention she desired, so she assumed that C.P.'s motivation for telling the initial lie was simply to get attention. She denied that her daughter had ever acted out sexually, but she had caught her "playing doctor" with her brother. She described her daughter as extremely nosy, which explained her finding the pornographic pictures.
As for the blow-up that occurred once the bedroom door was unlocked, the mother admitted that when she became angry, it "was not a pretty sight," and she was mad at everyone before the door was even openedat C.P. for being a pest and at Raymond for insisting on buying lobster for dinner when they could not afford it. Once C.P. accused Raymond of molesting her, she immediately believed what her daughter said was true and thought that Raymond was being serious when he described his desires toward her daughter. However, she noted that he did not have an erection when she walked into the room, and when they cleaned C.P.'s room *760 the next day, she found no evidence of semen or sexual activity.
As for the suicide attempt, C.P.'s mother explained on direct that Raymond had attempted to take his life by slashing his wrists once before, when the phone had been cut off for nonpayment. She admitted that he needs significant counseling, but once she realized that her daughter had lied, she wanted him out of jail.
The statement the defendant made to the mother, whether seriously or in jest, about what he desired to do to C.P., undoubtedly bolstered the prosecution's case against him. The prosecution made further inroads into C.P.'s credibility when it had the investigating detective repeat what the victim and her mother had told him two days after the incident. A number of details conflicted with C.P.'s testimony at trial.
Detective Venero detailed what the mother had told him during his initial investigation, which conflicted in several respects with her trial testimony.[1] For instance, she told him that she was off the phone in a matter of moments, went to the bedroom door, listened for a few minutes but did not hear anything, then knocked on the door. Raymond said, "The mice are outhang on a minute." The mother then banged on the door, did not see the mice out, and did not think he had time to put them away. Her daughter looked as if she had been caught doing something wrong. Therefore, she took C.P. to another room where her daughter said that her daddy made her suck his privates. This enraged the mother, leading to the verbal and physical confrontation with Raymond, who began packing his things and then went into the bathroom and slit his wrists and arms. The mother also relayed to Detective Venero the statement the defendant had made about what he wanted to do, which occurred at the beginning of their protracted altercation, and she also said that he never at any point denied that he had done what he was accused of doing.
Over objection, the detective recounted C.P.'s hearsay statements concerning the event. According to C.P., when Ray opened his towel or other clothing and looked down, she knew that she was to perform oral sex on him. She knew how to do it because he showed her a picture, and she described with particularity where she put her hand, what she did, what came out of his penis, and how the white stuff tasted. She was "fairly articulate" about the white stuffwhen it came out and when it did not. C.P. was pretty certain that she had done this twelve times in the past. Then, a few days after his interview with C.P., the mother called Detective Venero and told him that she had found photographs of a woman performing oral sex on a man.
The detective further testified that C.P.'s examinations revealed no physical evidence of abuse or venereal disease. The defendant's towel was examined for semen but none was found, nor did forensic examination of C.P.'s room reveal any evidence of semen.
A child protection team registered nurse practitioner related C.P.'s statements to her: that Ray made her suck his private, that white stuff came out, and that he had made her do this twelve times. She found no physical manifestations of sexual abuse or of venereal disease. However, in the case of oral sex, it is highly unlikely that there would be any forensic material to be discovered.
*761 A final line of questioning explored the credibility of C.P. and her mother concerning the child's decision to change her story. A jail inmate present when two women and a child came to visit the defendant testified that he overheard some of their conversation. He claimed that the defendant told the women that they had to get the little girl to "recamp" her story because otherwise he was looking at life in prison. Furthermore, approximately two days before this visit the inmate overheard the defendant's end of a telephone conversation in which the defendant said something about a towel, suggesting that they could claim that both he and the little girl had used the same towel after bathing. This inmate had been convicted of seven felonies and was on sex offender probation at the time of trial, but the prosecutor had not promised him anything for his testimony.
A former family friend, Kristin, testified last. This was a person C.P. did not like, who had been thrown out of their home by the mother after the child recanted. Kristin testified about events the night of the incident as well as the circumstances under which C.P. changed her story. According to this former friend, C.P. told her that "it really did happen" but her mother wanted her to change her story. On the night that C.P. confessed that she had been lying, however, Kristin overheard the mother yelling at her child in the bathroom, exhorting her to tell the truth and warning that she would beat her within an inch of her life if she was lying.
At the conclusion of the State's case, the defense moved for judgment of acquittal, contending that the prosecution had adduced no direct evidence that C.P. had been sexually abused. Instead, the evidence compiled against Mr. Baugh consisted of C.P.'s prior hearsay statements, which were repeated by her mother, the detective, and the child protection worker. In addition, the prosecution introduced the defendant's statement, made to the mother, about how he would like to sexually molest the child and have the mother watch, but this was not really an admission but a statement of desire. Although no photographs were introduced at trial, both the detective and the mother testified that a photograph depicting an act of oral sex was found in the home. The child and her mother both testified about new rules that were introduced concerning clothing and locked doors, which the prosecution hoped would convince the jury that the mother believed C.P.'s original story; however, the mother explained that, initially, she did believe the first story. The defendant's cutting of his wrists and arms almost immediately after the accusation was characterized by the prosecution as evincing his consciousness of guilt but was explained by the defense as demonstrative of the defendant's unbalanced mental state: he had done the same thing when the telephone was turned off. Two witnesses were introduced to suggest that the mother had influenced the child to change her story, but both the jail inmate and Kristin had damaged credibility. Finally, C.P.'s exclamation to her motherthat her daddy had made her suck his dickwas characterized by the prosecution as a spontaneous statement, which enshrouded it with greater evidentiary value than a section 90.803(23) child victim hearsay statement made under other circumstances.
THE EFFECT OF ADMITTING CHILD VICTIM HEARSAY WHEN THE CHILD HAS RECANTED
We have detailed the trial testimony so extensively in an attempt to paint a picture of the significant problem this case presents. Here, the prosecution's star witness testified solely about what did not happen and gave a plausible explanation for how *762 she came to know of things no seven-year-old child should ever have to know and why she accused the defendant of those acts. The State's burden was to tear that story down bit-by-bit, and it did so by repeated introduction of the version of events that the child was repudiating at trial. In addition, the State highlighted discrepancies between the child's and the mother's testimoniesas well as between the in-court and out-of-court versions of eventsconcerning small details, such as whether Ray had mice in his hand when the door was opened, how long it took for the door to be unlocked, and how C.P. was punished for initially lying once she decided to tell the truth. All of the evidence the State presented was intended to corroborate the statements introduced through section 90.803(23).
At the outset, we note that the trial court did an exemplary job in its conduct of the pretrial hearing to determine whether the "time, content, and circumstances of the statement provide[d] sufficient safeguards of reliability." § 90.803(23)(a)(1). The court entered a detailed order finding that the statements C.P. made to the detective, the child protection worker, and to Kristin evidenced a sufficient degree of trustworthiness and reliability and, based upon the child testifying at trial, were admissible as a hearsay exception under section 90.803(23). The court concluded that the State could introduce the child hearsay statements without undue or unlawful prejudice to the defendant. In reaching those conclusions after the pretrial hearing, however, the court admitted that it was left with "some nagging concerns" about C.P.'s testimony at the hearing, which was appropriately responsive to non-leading questions. Her demeanor did not change when she testified about her original allegations and the fact that they were lies. Essentially, however, based upon the picture of the family dynamic that was drawn in the testimony of C.P., the mother, and the family friend, the court concluded that the child did not receive much positive attention from her mother, that she would indeed be fearful of getting in trouble for lying, and that she told the truth in her initial allegations but later untruthfully recanted to "satisfy her mother's concerns about the Defendant, and her desire to have him back home and in their lives." Thus, the trial court's decision to allow the hearsay statements was influenced to some degree by its own decision concerning C.P.'s credibility.
Our court has observed that, when a child's in-court testimony directly contradicts the out-of-court hearsay statements, there can be "serious problems with a trial judge determining [the hearsay statements'] reliability .... in the face of the directly contradictory in-court ... statements under oath.... It seems to place the trial judge in the position of determining the credibility of the witnesses." Jaggers v. State, 536 So.2d 321, 325 (Fla. 2d DCA 1988). When a child has told two diametrically opposing stories, one version must necessarily be false. Thus, when determining that the out-of-court statements are trustworthy and reliable, the judge consequently is determining that the in-court version is false, that the child is lying, effectively stamping judicial approval upon accusations made in a setting where the defendant had no opportunity to cross-examine his accuser. In this case, however, we find that the trial judge appropriately applied the factors set out in section 90.803(23)(a)(1): "the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, and any other factor deemed appropriate...."

*763 RELIABILITY OF THE CHILD VICTIM HEARSAY
The question with which this court is presented is whether the victim's recantation of her statements rendered them so critically unreliable that the State did not carry its burden of adducing legally sufficient evidence to sustain Mr. Baugh's conviction. The defense argued vehemently that C.P.'s hearsay statements should be considered by the jury only as impeachment; in fact, the defense attorney convinced the judge to give an instruction to that effect, which is the issue on the State's cross-appeal. It appears, however, that the jury did not understand that instruction, or, if they did, they ignored it.
At the hearing on the defendant's motion for judgment of acquittal, the prosecutor admitted his concern with the legal weight of the evidence. He made this telling admission: "The irony of all ironies in this case, Judge, is that the only way that I think I can get this to a jury is the fact that [the mother] testified what [C.P.] said immediately after the incident, therefore that makes it a spontaneous statement. That spontaneous statement in and of itself allows this case to get to a jury." The prosecutor implied that, because of the child's recantation, he considered the child "unavailable as a witness" as that term is described in section 90.803(23)(a)(2)(b). When a child is unavailable, hearsay statements are admissible only "provided there is other corroborative evidence of the abuse or offense." Id. Under the prosecutor's view of the evidence, C.P.'s exclamation to her mother, occurring shortly after the mother found C.P. and the defendant together behind a locked doorthat "Ray made me suck his dick"came in under section 90.803(1) as a spontaneous statement hearsay exception. Thus, there was "other corroborative evidence ... of the offense," § 90.803(23)(2)(b), so that even if the recantation rendered C.P. legally "unavailable," her hearsay statements would be admissible.
A trend apparent in recent Florida decisions suggests that the prosecutor worried somewhat needlessly about the need for corroboration. Although we have grave reservations about the use of the conflicting out-of-court child hearsay as the only substantive evidence of abuse, in the unique circumstances of this case, the trial court's decision to admit the statements and to deny the defense motion for judgment of acquittal comports with recent decisions from the Florida Supreme Court.
As we mentioned earlier, our court has warned against the danger to the fact-finding process when a child victim's out-of-court statement is admitted in the face of directly contradictory in-court testimony. The trial judge's decision to admit the testimony through the machinery of section 90.803(23) "seems to place the trial judge in the position of determining the credibility of witnesses." Jaggers, 536 So.2d at 325. The Jaggers court concluded that there was "a total lack of reliable evidence to support the element of penetration," id. at 322, and reversed two of the defendant's convictions.
The key to the admissibility of the statements is their reliability. In State v. Green, 667 So.2d 756 (Fla.1995), the supreme court wrestled with the issue of whether a prior inconsistent statement of an alleged child victim of sexual abuse, even if repeated on multiple occasions as in this case, is sufficient in and of itself to sustain a conviction. The court concluded that it was not. The statements in Green were not prior inconsistent statements made under oath for purposes of section 90.801(2)(a), but they could have been admitted under section 90.803(23). The Green court specifically held that it would *764 not matter whether the statement was admitted under either hearsay exception, quoting with approval the following language from Jaggers, 536 So.2d at 325: "[W]e do not find the intent of section 90.803(23) is to allow the state to breathe substantive reliability into ... prior inconsistent statements when they are otherwise admissible only to impeach those prosecuting victim witnesses whose testimony is introduced by the state at trial...." This is not a matter of technicalities but of concern for the defendant's Sixth Amendment right to confront witnesses and the paramount necessity of avoiding "convicting an innocent accused ... when the conviction is based entirely on prior inconsistent statements." Green, 667 So.2d at 761 (quoting State v. Moore, 485 So.2d 1279, 1281 (Fla.1986)).
In Green the victim was retarded but had a mental age of seven, the same as C.P. Unlike C.P., however, who manifested no outward signs of abuse, the victim in Green showed physical changes consistent with vaginal penetration. She told her sister and sister-in-law that Green had forced her to have sex, but at trial she recanted and identified another man as her abuser. A consideration for the finding that the inconsistent statement could not stand as the only evidence to convict the defendant was "the immense potential for manipulation of a retarded child." Green, 667 So.2d at 761. In this case, C.P., too, although not retarded and apparently quite articulate, was certainly susceptible to manipulation by the adults upon whom she was totally dependent. However, a significant difference between Green and this case is that Green involved the identity of the perpetrator whereas here the issue was whether or not the crime had actually been committed.
Green concluded with the court's observation that its decision was not meant to bar any use of inconsistent statements as substantive evidence, as long as "other proper corroborating evidence is admitted." Id. Thus, pursuant to Green, this court certainly cannot and does not hold that the trial court erred in its pretrial decision to admit C.P.'s out-of-court statements into evidence, but C.P.'s inconsistent statements should not be considered any more reliable than any other inconsistent statements simply because they were admitted pursuant to section 90.803(23). Under Green, those statements alone could not convict Mr. Baugh; other corroborating evidence is essential. However, the logic of finding that the corroboration can consist of C.P.'s initial "spontaneous" statement to her motherthat Ray made her suck his privatesescapes us. This would seem to be another way of "breathing substantive reliability into ... prior inconsistent statements when they are otherwise admissible only to impeach those prosecuting victim witnesses whose testimony is introduced by the state at trial...." Green, 667 So.2d at 760 (quoting Jaggers, 536 So.2d at 325). The Green court concluded that "in a criminal prosecution, a prior inconsistent statement [whether admitted pursuant to section 90.803(23) or 90.801(2)(a)] standing alone is insufficient as a matter of law to prove guilt beyond a reasonable doubt." Green, 667 So.2d at 760 (relying upon and reaffirming State v. Moore, 485 So.2d 1279 (Fla.1986)).
A couple of years after Green the supreme court decided Department of Health & Rehabilitative Services v. M.B., 701 So.2d 1155 (Fla.1997). In that case, a dependency proceeding, the court specifically found that there was no requirement that statements admitted under the child victim hearsay exception be consistent with the child's in-court testimony. The court approved the admission of the inconsistent statements as substantive evidence *765 once they satisfied the strict reliability safeguards set out in section 90.803(23) and refined in such cases as State v. Townsend, 635 So.2d 949 (Fla.1994); Pardo v. State, 596 So.2d 665 (Fla.1992); and Glendening v. State, 536 So.2d 212 (Fla.1988). In M.B., 701 So.2d at 1161, the supreme court approved of the following commentary by Professor Ehrhardt:
There is some authority that, if the victim's trial testimony does not indicate that abuse occurred, the victim's out-of-court statements that the abuse occurred are not sufficient, by themselves, to support a conviction. The rationale for these decisions is not clear. If the rationale is that the out-of-court statement is lacking the necessary reliability as a result of the circumstances in which it was made, the analysis is appropriate. Section 90.803(23) and the defendant's confrontation rights require this analysis. If the basis is that, because the out-of-court statement is admissible simply because it is inconsistent with the in-court testimony of the witness, the reasoning should not be followed. Although a prior statement which is admitted pursuant to section 90.801(2) is not sufficient by itself to support a conviction, the rationale should not be extended to statements admitted under a section 90.803 hearsay exception. These exceptions are surrounded by circumstantial guarantees of reliability which are not necessarily present when a statement is offered under section 90.801(2).
Charles W. Ehrhardt, Florida Evidence § 802.23, at 702 (1996 ed.) (footnote omitted; emphasis added).
After quoting this language from Ehrhardt, which refers specifically to the sufficiency of evidence to support a conviction, the supreme court in M.B. distinguished the dependency case before it from the criminal convictions involved in Green and Moore:
Our rulings in Green and Moore were primarily concerned with the minimum standard of evidence required to sustain a conviction and the potential miscarriage of justice that could occur if that standard was not maintained. We were also concerned, of course, about the constitutional rights of the accused in a criminal proceeding. See Green, 667 So.2d at 760. Those concerns are not present in these dependency proceedings, where it is undisputed that the child victim was the subject of sexual abuse, and the issue is the child's welfare and not the alleged abuser's criminal culpability. We conclude that Green, because of its unique circumstances and the substantial distinctions from this case as noted above, does not control the outcome here.
M.B., 701 So.2d at 1162.
In this case, of course, we are concerned with the minimum standards to support Mr. Baugh's conviction and with his constitutional rights. Taking all of these cases together, it appears that the child victim's inconsistent out-of-court statements were admissible as substantive evidence, not as impeachment only; but in line with the requirement set out in Green, there must be other corroborating evidence to support the conviction. And in this case, as in Green, we must determine whether the reliability of C.P.'s statement that she was sexually molested by Mr. Baugh had been so diminished by C.P.'s in-court testimony that "we could not have sufficient confidence in the criminal conviction to allow it to stand." M.B., 701 So.2d at 1162 (referring to Green). See also Brantley v. State, 692 So.2d 282, 282 (Fla. 1st DCA 1997) (quoting Green, 667 So.2d at 760, for the proposition that the "law in this state is that prior unsworn, inconsistent, and *766 uncorroborated statements cannot constitute the only substantive evidence to sustain a conviction"); Ticknor v. State, 595 So.2d 109, 110 (Fla. 2d DCA 1992) ("Unsworn, uncorroborated statements that are inconsistent with the victim's trial testimony... are insufficient as a matter of law to sustain a conviction."); Bell v. State, 569 So.2d 1322, 1323 (Fla. 1st DCA 1990) ("Because the only evidence presented by the state was the prior, unsworn, inconsistent, and uncorroborated statement, the state did not meet its burden of proving the elements of the crime beyond a reasonable doubt, and a judgment of acquittal should have been granted."); Williams v. State, 560 So.2d 1304, 1306 (Fla. 1st DCA 1990) ("The rule that prior inconsistent statements may not be used substantively as the sole evidence to convict, see Moore, applies to [s]ection 90.803(23) evidence as well.") (quoting Jaggers, 536 So.2d at 324). However, the supreme court in M.B., 701 So.2d at 1162, referred with approval to the following statement made (in dicta) in Anderson v. State, 655 So.2d 1118, 1120 (Fla.1995): "[W]e decline to enunciate a blanket rule that no conviction can stand based solely on hearsay testimony." Cf. Williams v. State, 714 So.2d 462, 466 (Fla. 3d DCA 1997) (holding that the excited utterance exception to the hearsay rule, section 90.801(2), is a firmly rooted exception because the circumstances under which such statements are made "eliminate the possibility of fabrication, coaching, or confabulation," and that incriminating statements admitted pursuant to the excited utterance exception were sufficient, on their own, to send the case to the jury) (quoting Idaho v. Wright, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)).

CONCLUSION
In responding to the motion for judgment of acquittal in this case, the prosecutor described the corroborating evidence as follows: the spontaneous statement from C.P. to her mother immediately after the event; the defendant's "admission" ("I want her to suck my dick while you watch"); the defendant's consciousness of guilt as evidenced by his suicide attempt; and the suggestion that the defendant engaged in "witness tampering," adduced from the testimonies of the prison inmate and the mother's former friend. None of this alleged corroboration carries much evidentiary weight. Of course, the question is not its weight but its legal sufficiency.
In our view, each of these grounds, individually, would fail as sufficient corroboration of Mr. Baugh's guilt. Labeling C.P.'s out-of-court statement as a spontaneous statement really is not helpful to the State, because, in spite of the court's jury instruction to the contrary, the statement did come in as substantive evidence pursuant to section 90.803(23); putting another name on it would not have made it any more corroborative of the event, especially considering that the jury knew that C.P.'s initial accusation occurred very close in time to the alleged crime. The defendant's "admission" is not really an admission at all, but a statement of desire and not of a completed act ("I want her to suck my dick while you watch"), although the jury might infer past conduct from the statement. The fact that the defendant slashed his wrists almost immediately after the charges were made, when viewed as required in the light most favorable to the State, is suggestive of guilt, even though his action is equally susceptible of an interpretation that he was despondent over the accusation and was in need of intensive psychotherapy. Finally, the testimony of the jail inmate and the former friend concerning C.P.'s recantation, which the State argued indicated that Mr. Baugh engaged in "witness tampering," reveals *767 that Mr. Baugh knew that he would never get out of jail unless C.P. changed her story. That was true; as long as C.P. alleged that Mr. Baugh committed the crime, he had little hope of being released. However, that does not indicate that her original story was either true or corroborative of his guilt.
In spite of our hesitation to say that any one piece of "corroboration" would be sufficient, together with the out-of-court statements, to sustain this conviction, all of the inferences that the jury could draw from the sum total of the evidence lead us to the conclusion that the trial court correctly denied Mr. Baugh's motion for judgment of acquittal. Although close, this case is not one in which we determine that C.P.'s out-of-court testimony was so diminished by her in-court denial of all of the events that we do not have sufficient confidence in the conviction to allow it to stand. Cf. M.B, 701 So.2d at 1162 (commenting on Green, 667 So.2d at 760).
However, in light of what we feel is a need for clarification of some of these issues, we certify the following question of great public importance:
IF A CHILD VICTIM OF SEXUAL ABUSE TOTALLY REPUDIATES HER OUT-OF-COURT STATEMENTS AT TRIAL, AND THE PROSECUTION ADDUCES NO EYEWITNESS OR PHYSICAL EVIDENCE OF ABUSE, MUST THE TRIAL COURT GRANT A JUDGMENT OF ACQUITTAL EVEN IN THE FACE OF OTHER EVIDENCE CORROBORATING THE OUT-OF-COURT STATEMENTS AND THE DICTATES OF THE CONFRONTATION CLAUSE?
As the foregoing indicates, we answer that question in the negative based upon the decisions of the courts of this state.
Accordingly, we affirm. We also hold that the trial court erred in instructing the jury to consider C.P.'s out-of-court statements as impeachment only, but in light of our disposition of the main appeal, the cross-appeal is moot.
Affirmed.
KELLY, J., and THREADGILL, EDWARD F., Senior Judge, concur.
NOTES
[1] We are unsure on what basis the mother's statements to Detective Venero were admitted, but the defense did not object to that line of testimony.