961 So.2d 198 (2007)
Raymond BAUGH, Petitioner,
v.
STATE of Florida, Respondent.
No. SC04-21.
Supreme Court of Florida.
April 26, 2007.
Rehearing Denied July 10, 2007.
*199 J. Marion Moorman, Public Defender, Tenth Judicial Circuit, Bartow, FL, and James T. Miller, Special Assistant Public Defender, Jacksonville, FL, for Petitioner.
*200 Bill McCollum, Attorney General, Tallahassee, FL, Robert J. Krauss, Bureau Chief, Tampa Criminal Appeals and Richard Michael Fishkin, Assistant Attorney General, Tampa, FL, for Respondent.
QUINCE, J.
We have for review Baugh v. State, 862 So.2d 756 (Fla. 2d DCA 2003), in which the Second District Court of Appeal certified the following question as a matter of great public importance:
IF A CHILD VICTIM OF SEXUAL ABUSE TOTALLY REPUDIATES HER OUT-OF-COURT STATEMENTS AT TRIAL, AND THE PROSECUTION ADDUCES NO EYEWITNESS OR PHYSICAL EVIDENCE OF ABUSE, MUST THE TRIAL COURT GRANT A JUDGMENT OF ACQUITTAL EVEN IN THE FACE OF OTHER EVIDENCE CORROBORATING THE OUT-OF-COURT STATEMENTS AND THE DICTATES OF THE CONFRONTATION CLAUSE?
Id. at 767. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
As worded, we conclude that the certified question does not accurately reflect the circumstances of the instant case. The "corroborating" evidence offered in support of repudiated out-of-court statements by a child sexual abuse victim must corroborate the facts of the sexual act stated by the victim. Accordingly, we reword the question as follows:
If a child victim of sexual abuse totally repudiates her out-of-court statements at trial, and the prosecution adduces no eyewitness or physical evidence of abuse, must the trial court grant a judgment of acquittal when the other evidence presented by the prosecution does not corroborate the facts alleged in the victim's repudiated statement?
For the reasons discussed below, we answer the reworded question in the affirmative and quash the decision of the Second District.

STATEMENT OF THE CASE AND FACTS
On the evening of January 13, 2002, Raymond Baugh's girlfriend, Rachel, was on the phone ordering food for dinner. When her seven-year-old daughter, C.P., persisted in interrupting her conversation, Rachel sent C.P. to her bedroom. Baugh, who lived with Rachel, followed C.P. into the bedroom and closed the door. When Rachel ended her conversation, she attempted to enter C.P.'s room but found that the door was locked. C.P. testified that she had been playing with the lock earlier and the door accidentally locked when Baugh closed it behind him. Rachel proceeded to bang on the door and demand that it be opened. When the door was opened thirty seconds later, Rachel saw Baugh standing in the bedroom wrapped in a towel and holding two white mice in his hands. C.P. was standing behind him. Apparently, Baugh entered the bedroom after bathing and was only wearing a towel. Baugh intended to feed the mice to a pet snake in the bedroom. Baugh, 862 So.2d at 757.
After separating C.P. from Baugh, Rachel asked C.P. what had happened. C.P. responded that Baugh made her perform fellatio on him. Rachel accosted Baugh with this information, hit him several times, and demanded that he leave her house. Baugh denied doing what C.P. claimed. As the argument between Rachel and Baugh progressed, Baugh stated that he wanted C.P. to perform fellatio on him, have Rachel watch, and then have sex with Rachel. Thereafter, Rachel called the police and Baugh went into the bathroom *201 where he attempted to slash his wrists and arms.
C.P. recounted the incident to a police detective the next day. C.P. told the detective that "it happened," that she had performed the same act on Baugh twelve times previously, and that "white stuff came out, which tasted bad." Baugh, 862 So.2d at 758. She also told investigators that Baugh had shown her pictures to teach her how to perform oral sex. C.P. repeated this story to the state attorney and the detective on January 24 and to the child protection team nurse on January 28. However, according to Rachel, sometime in late February, C.P. voluntarily recanted her story and told her mother that she had lied about what happened with Baugh.
At Baugh's trial for capital sexual battery, C.P. testified that her original story was a "fib" which she made up to get Baugh in a "`little, but not that much trouble,' because sometimes he made her mad." Id. at 757-58. C.P. also stated that she learned the details of the sexual act from her older brother who had been assaulted by a different individual in a manner identical to what she had described to the detective. C.P. explained that she maintained her story about Baugh because she was afraid of what her mother might do if she found out that C.P. had lied. C.P. stated that she ultimately decided to tell the truth because she was sad that her family had been broken apart. C.P. also stated that Baugh had never shown her the pornographic pictures that the police recovered from their house; she had found them while snooping in her mother's bedroom. C.P. also testified about new house rules instituted by Rachel after the incident, including a rule regarding proper clothing in the house and a prohibition on locking the interior doors of the house. The State argued that these rules showed that Rachel believed C.P.'s original story.
At the conclusion of C.P's testimony, the State had demonstrated that the child had first accused Baugh of molesting her, repeated that story to a number of people, and then changed her story. During their testimony, the detective, the child protection team nurse, and Rachel repeated C.P.'s prior statements about the incident. Thereafter, the State introduced testimony from an inmate imprisoned with Baugh and a former friend[1] of Rachel's in order to rebut the testimony of C.P. and Rachel concerning the child's decision to change her story. The inmate claimed that he overheard Baugh telling female visitors that "they had to get the little girl to `recamp' [sic] her story because otherwise he was looking at life in prison." Id. at 761. The family friend testified that C.P. told her "`it really did happen' but [Rachel] wanted her to change her story." Id. The State failed to produce physical or direct evidence to support C.P.'s original story of abuse.
At the conclusion of the State's case, Baugh moved for a judgment of acquittal, contending that the State had adduced no direct evidence that C.P. had been sexually abused. The trial court denied the motion. Baugh was subsequently convicted of capital sexual battery on C.P. and sentenced to life in prison.
On appeal, Baugh asserted that C.P.'s prior out-of-court statements were insufficient to sustain his conviction. The Second District agreed and held that C.P.'s out-of-court hearsay statements alone could not sustain Baugh's conviction for *202 capital sexual battery. However, the Second District concluded that "there was some other evidence that would give rise to the inference that Mr. Baugh committed the crime of which he was accused." Baugh, 862 So.2d at 757. The Second District described the following "corroborating" evidence: "the spontaneous statement from [the child] to her mother immediately after the event; the defendant's `admission' ("I want her to s[-]ck my d[-]ck while you watch"); the defendant's consciousness of guilt as evidenced by his suicide attempt; and the suggestion that the defendant engaged in `witness tampering,' adduced from the testimonies of the prison inmate and the mother's former friend." Id. at 766. The Second District admitted its "hesitation to say that any one piece of `corroboration' would be sufficient" in conjunction with the out-of-court statements to sustain Baugh's conviction. Id. at 767. However, the Second District concluded that, based on the inferences that the jury could draw from all of the evidence, the trial court correctly denied Baugh's motion for judgment of acquittal. Id. In light of this corroborative evidence, the Second District affirmed the conviction. Additionally, the Second District certified the original question above to this Court based on a perceived "need for clarification of some of these issues." Id.[2]

ANALYSIS
The instant case is similar to Beber v. State, 887 So.2d 1248 (Fla.2004), because like Beber this case involves the admission of pretrial statements as substantive evidence under the child victim hearsay exception in section 90.803(23), Florida Statutes (2001), after the child recanted the pretrial statements during her in-trial testimony. In Beber, the Fifth District concluded that an out-of-court videotaped statement by the child victim, which had been admitted pursuant to section 90.803(23), was sufficient to sustain Beber's conviction of capital sexual battery for fellatio, even though there was no corroborating evidence other than the child's in-court testimony that Beber perpetrated other sexual crimes on him,[3] and even though the child contradicted his videotaped statement in court. Beber v. State, 853 So.2d 576 (Fla. 5th DCA 2003), quashed, 887 So.2d 1248 (Fla.2004). In our review, we quashed the decision of the Fifth District and reaffirmed our previous holding in State v. Green, 667 So.2d 756 (Fla.1995), and State v. Moore, 485 So.2d 1279 (Fla.1986), that prior inconsistent statements are insufficient by themselves to sustain a criminal conviction. Beber, 887 So.2d at 1253.
The Second District's analysis in Baugh is consistent with our reasoning in Beber. The Second District recognized that the child's out-of-court hearsay statements, which directly conflicted with her in-court testimony, were not sufficient by themselves to sustain Baugh's conviction and *203 that "there must be other corroborating evidence to support the conviction." Baugh, 862 So.2d at 765.
The Second District acknowledged that none of the alleged corroboration carried much evidentiary weight and that when considered individually "each of these grounds . . . would fail as sufficient corroboration of Mr. Baugh's guilt." Id. at 766. The Second District noted problems with each piece of the alleged corroborating evidence. C.P.'s "spontaneous statement" to her mother was part of the substantive evidence admitted under section 90.803(23) and "putting another name on it" did not make it any more corroborative of the event. Id. Baugh's "admission" was "not really an admission at all, but a statement of desire and not of a completed act." Id. While Baugh's suicide attempt was "suggestive of guilt," it was "equally susceptible of an interpretation that [the defendant] was despondent over the accusation and was in need of intensive psychotherapy." Id. Finally, the court said that the testimony of the jail inmate and former friend revealed that Baugh "knew he would never get out of jail unless [the child] changed her story. That was true; as long as [the child] alleged that Mr. Baugh committed the crime, he had little hope of being released. However, that does not indicate that her original story was either true or corroborative of his guilt." Id. at 766-67. Despite the Second District's "hesitation" to find the corroborating evidence and the out-of-court statements sufficient to sustain Baugh's conviction, the court concluded that denial of Baugh's motion for judgment of acquittal was correct in light of "all of the inferences that the jury could draw from the sum total of the evidence." Id.
Thus, we must determine whether the evidence presented at Baugh's trial to corroborate the child victim's out-of-court statements was sufficient to sustain his conviction. Baugh was charged with capital felony sexual battery pursuant to section 794.011(2)(a), Florida Statutes (2001). The elements of this crime are (1) a person eighteen years of age or older (2) commits a sexual battery[4] upon (3) a person less than twelve years of age. In her original statement the child alleged that Baugh made her perform fellatio on him. The age of the defendant and the victim are not at issue here. Thus, the evidence presented in corroboration had to demonstrate that fellatio occurred and that the defendant was the person who forced the child to commit this act. We conclude that none of the other evidence, either individually or collectively, corroborated the statement concerning fellatio.
The only direct evidence[5] presented in this case was the child's out-of-court hearsay statements, which she completely recanted during her in-court testimony. The evidence which was offered as "corroborating" these out-of-court statements, as required by Green and Moore, was circumstantial evidence from which the jury had to infer that Baugh had perpetrated a sexual battery on the child.
"The rule is well established that the prosecution, in order to present a prima *204 facie case, is required to prove each and every element of the offense charged beyond a reasonable doubt, and when the prosecution fails to meet this burden, the case should not be submitted to the jury, and a judgment of acquittal should be granted." Williams v. State, 560 So.2d 1304, 1306 (Fla. 1st DCA 1990). In reviewing a motion for judgment of acquittal, a de novo standard of review applies. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. Id. There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. Banks v. State, 732 So.2d 1065 (Fla.1999).
As we held in Green and reaffirmed in Beber, "a prior inconsistent statement standing alone is insufficient as a matter of law to prove guilt beyond a reasonable doubt." Green, 667 So.2d at 760; accord Beber, 887 So.2d at 1251. However, recanted statements can sustain a sexual battery conviction "when other proper corroborating evidence is admitted." Green, 667 So.2d at 761 (emphasis added); see Beber, 887 So.2d at 1252-53. Corroborating evidence is defined as "[e]vidence that differs from but strengthens or confirms what other evidence shows," especially "that which needs support." Black's Law Dictionary 596 (8th ed.2004).
In the instant case, the question is whether the other evidence presented at trial corroborated the child's recanted out-of-court statement and, if so, whether the evidence was sufficient to convict Baugh. Baugh was charged with a capital felony sexual battery pursuant to section 794.011(2)(a), Florida Statutes (2001). The information specified that Baugh, who was over eighteen years of age, committed a sexual battery on a child less than twelve years of age by placing his penis into or in union with the mouth of the child. The only evidence adduced at trial that Baugh placed his penis in the child's mouth was the child's out-of-court statements, which she recanted during her in-court testimony. We conclude that the other evidence collectively did not actually "corroborate" the recanted out-of-court statements.
Even if Baugh's purported "admission" is viewed as a statement of desire rather than a rash response during a heated argument, it still only shows that he had thoughts about committing sexual battery on the child, not that he actually committed the act. The fact that Baugh slashed his wrists after being confronted by the child's mother may be "suggestive of guilt," but is also consistent with a troubled defendant in need of psychotherapy, as evidenced by Baugh's earlier suicide attempt by the same method when his telephone service was turned off for nonpayment. Although the new household rules concerning clothing and locked doors indicate that the mother believed the child's original story, the mother readily admitted that she initially did believe the story. Finally, while the testimony of both the jail inmate and the former friend[6] about the child's recantation could *205 indicate that the child was pressured to change her story, it also reflected the reality of the situationBaugh would not get out of jail as long as the child alleged that he committed the crime. Thus, the evidence presented to "corroborate" the child's recanted out-of-court statements did not necessarily strengthen or confirm the recanted out-of-court statements. See Baugh, 862 So.2d at 766-67 (discussing the problems with each item of "corroborating" evidence and noting how each could be interpreted in a manner entirely consistent with innocence).
Where the evidence creates only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction. Cox v. State, 555 So.2d 352, 353 (Fla.1989). Additionally, evidence is insufficient to support a conviction when it requires pyramiding of assumptions or impermissibly stacked inferences. Cf. Gustine v. State, 86 Fla. 24, 97 So. 207, 208 (1923) (reversing conviction because "[o]nly by pyramiding assumption upon assumption and intent upon intent can the conclusion necessary for conviction be reached"); Brown v. State, 672 So.2d 648, 650 (Fla. 4th DCA 1996) (finding evidence insufficient when it requires pyramiding of assumptions or inferences in order to arrive at the conclusion of guilt).

CONCLUSION
For the reasons discussed above, we answer the reworded certified question in the affirmative and quash the decision of the Second District.
It is so ordered.
LEWIS, C.J., and WELLS and PARIENTE, JJ., concur.
CANTERO, J., dissents with an opinion, in which ANSTEAD and BELL, JJ., concur.
CANTERO, J., dissenting.
I dissent from the result in this case because it nullifies a jury's guilty verdict based essentially on credibility choices. I do so for two reasons. First, I disagree with the reworded certified question, which does not accurately describe the circumstances of this case. I also disagree with the majority's conclusion that the evidence is insufficient to support the defendant's conviction. Looking at the evidence cumulatively, I agree with the district court that it supports the jury's verdict. I will explain each of these disagreements in turn.

I. The Certified Question
The majority rewords the certified question to ask whether the defendant's conviction for capital sexual battery of a seven-year-old girl can stand "when the other evidence presented by the prosecution does not corroborate the facts alleged in the victim's repudiated statement." Majority op. at 200 (emphasis added). Not only does the question, as the majority poses it, answer itself, but it is the opposite of the question the district court certified, which was whether the defendant's conviction can stand in light of "other evidence corroborating the out-of-court statements." Baugh v. State, 862 So.2d 756, 767 (Fla. 2d DCA 2003) (emphasis added). The Court's new question is unnecessary because we have already decided that issue. See, e.g., Beber v. State, 887 So.2d 1248, 1251 (Fla.2004) (disallowing sexual battery convictions "where the only evidence of fellatio was the child's hearsay statements"); State v. Moore, 485 So.2d 1279, 1281 (Fla.1986) (holding that "a prior inconsistent statement standing alone is *206 insufficient to prove guilt beyond a reasonable doubt"). Of course, the district court would not have certified such an obvious question because it, too, knew the answer. See Baugh, 862 So.2d at 757 (acknowledging that "the prior statements alone cannot sustain the defendant's conviction").
The rephrased question also does not accurately describe the evidence presented. As the district court recognized, the other evidence here clearly does corroborate the victim's out-of-court statements; the issue is whether that corroboration, which consisted of mostly circumstantial evidence, is enough to survive a motion for judgment of acquittal. The court's specific question was: "If a child victim of sexual abuse totally repudiates her out-of-court statements at trial, and the prosecution adduces no eyewitness or physical evidence of abuse, must the trial court grant a judgment of acquittal even in the face of other evidence corroborating the out-of-court statements and the dictates of the Confrontation Clause?" Id. at 767. In other words, the issue is whether recanted out-of-court statements, combined with other circumstantial evidence of the crime, suffice to defeat a motion for judgment of acquittal.
The most we have said on that topic is that recanted statements can sustain a sexual battery conviction "when other proper corroborating evidence is admitted." State v. Green, 667 So.2d 756, 761 (Fla.1995). In Green, the only evidence corroborating a mentally retarded teenager's allegation of sexual abuse was a doctor's testimony that "the size of her vaginal opening was consistent with some form of vaginal penetration." Id. at 757. Noting that the child claimed she had sex with someone other than the defendant, id., we concluded that the "physician's testimony . . . is simply not adequate to supply that corroboration." Id. at 761. We have not, however, explained how much corroboration would be "adequate." As the district court said, there "is a need for clarification." Baugh, 862 So.2d at 767. I would therefore answer the question certified.

II. The Sufficiency of the Evidence
The certified question really asks the question left unanswered in Green: how much corroboration is enough? In Green, we held that "in a criminal prosecution, a prior inconsistent statement standing alone is insufficient as a matter of law to prove guilt beyond a reasonable doubt." 667 So.2d at 760 (citing Moore, 485 So.2d 1279) (emphasis added). We also noted, however, that recanted statements can sustain a sexual battery conviction "when other proper corroborating evidence is admitted." Id. at 761. In Beber, 887 So.2d at 1251, we applied Green and again held that out-of-court statements that have been recanted at trial cannot, standing alone, support a criminal conviction. We acknowledged that "[w]hile inconsistent statements admitted under section 90.803(23) can be used as substantive evidence when other proper corroborating evidence is admitted, in Green's case we concluded that the testimony of the examining physician was `simply not adequate to supply that corroboration.'" Id. at 1252-53 (quoting Green, 667 So.2d at 761).[7] *207 Therefore, the proper question here is whether the circumstantial evidence corroborates the victim's recanted statements so that all the evidence, considered together, suffices to convict the defendant.
In reviewing the evidence, we must look cumulatively at both the corroborating evidence and the direct evidence (the victim's recanted statements) to determine if they were sufficient to avoid a judgment of acquittal. The legal standard is simply whether a rational jury, "viewing the evidence in the light most favorable to the State, . . . could find the existence of the elements of the crime beyond a reasonable doubt." Floyd v. State, 913 So.2d 564, 571 (Fla.2005) (quoting Pagan v. State, 830 So.2d 792, 803 (Fla.2002)). Moreover, in analyzing the sufficiency of the evidence, any issues of credibility must be resolved in favor of the State. See, e.g., Darling v. State, 808 So.2d 145, 155 (Fla.2002) ("The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal.") (quoting Lynch v. State, 293 So.2d 44, 45 (Fla. 1974)); Donaldson v. State, 722 So.2d 177, 182 (Fla.1998) ("The fact that the evidence is contradictory does not warrant a judgment of acquittal since the weight of the evidence and the witnesses' credibility are questions solely for the jury.") (citing Davis v. State, 425 So.2d 654, 655 (Fla. 5th DCA 1983)).
Applying this standard, I agree with the district court that the "sum total of the evidence" in this case was sufficient to submit the case to the jury. Baugh, 862 So.2d at 767. The strongest evidence, of course, is the seven-year-old victim's graphic description of the events in her room. After emerging from her locked bedroom with the defendant (her mother's live-in boyfriend), who was wearing only a towel, this seven-year-old girl told her mother that the defendant "made me suck on his dick." She repeated this accusation to an investigator two days after the incident, adding more details. According to the officer's testimony, the girl said the defendant "opened up his towel, that she placed his penis inside her mouth, that she held it with her right hand and she moved her right hand up and down on it as she had her mouth on it"a technique the defendant taught her, using a pornographic picture for demonstration. She said he did not ejaculate on the night in question because they were interrupted by her mother's knocking. But she recalled performing fellatio on him twelve other times. On the first occasion, she said that "white stuff came out [and] made her choke," so "she spit it out." She described it as "very bad tasting." Thereafter, the defendant told her "to swallow very fast and it wouldn't choke you like that." The incidents happened so frequently that the defendant developed a typical process of initiation: "If he opened the towel, or any type clothing that he may have been wearing at the time, and if he looked down, she knew that it was time for her to perform oral sex on him." The girl "volunteered" a similar story to a nurse practitioner, stating that the defendant "made me suck his private" twelve times, and recalling that he left "white stuff in my mouth."
These descriptions of sexual abuse were very graphic and detailed, containing the sort of information that no seven-year-old should know. They were also consistent over time. Nevertheless, more than a month after the incident, the girl suddenly recanted. She testified at trial that her knowledge of oral sex came primarily from a different source, an older brother who had been sexually abused, and that she found the pornography while snooping on her own. She testified that the defendant came into her room that night to scold her for bothering her mother, and that he merely closed a door that she forgot to *208 unlock earlier in the day. When her mother found them, she falsely accused the defendant of sexual abuse to get him in a "little, but not that much trouble." The girl admitted that, when she recanted, she "felt sad for our family" and "want[ed] our family back." But she denied that anyone had pressured her to change her story.
I acknowledge, as did the district court, that standing alone the girl's recanted accusations cannot sustain the defendant's conviction. See Baugh, 862 So.2d at 766. Our previous cases made that clear. See, e.g., Beber, 887 So.2d at 1251; Moore, 485 So.2d at 1281. Yet we have emphasized that recanted accusations can sustain a conviction if "other proper corroborating evidence is admitted." Green, 667 So.2d at 761. Corroborating evidence is generally defined as "[e]vidence that differs from but strengthens or confirms what other evidence shows." Black's Law Dictionary 596 (8th ed.2004). Such evidence needs only to strengthen or confirm the victim's recanted allegations to such an extent that a rational jury could find them truthful beyond a reasonable doubt.
The record in this case contains plenty of evidence that strengthens or confirms the victim's recanted allegations. The strongest confirmation comes from her mother, who testified about the evening of the incident. The door to her daughter's bedroom was locked. The mother banged on it three times, demanding that it be opened. It took "close to thirty seconds" before the door opened to reveal her daughter with the defendant. The mother now claims that the defendant was holding mice to feed to a snake. An officer testified, however, that the mother originally stated that, while the defendant used the mice as an excuse, "she did not see the mice out, and did not think he had time to put them away." Baugh, 862 So.2d at 760. Although the boyfriend did not have an erection when the door opened, the mother was sufficiently concerned that she separated her daughter from him, at which point the girl made her initial accusation of sexual abuse. The mother angrily confronted the defendant. According to what she later told investigators, the defendant never denied it. During their fight he yelled: "I want her to suck my dick, I want you to watch, and then I want to fuck you after." The mother testified that, at the time, she believed him. The defendant then tried to kill himself, slitting his wrists with a razor blade. Later that night, he told an officer that he wanted to be left alone "so he could die in peace." The mother admittedly believed that her daughter's accusations against the defendant were true. She called a friend "to come and remove me and my children from the household." When she returned home, she established new house rules regarding nudity and the locking of interior doors. She also invited her friend to move into the home for financial support.
The mother's statements to police during the initial investigation were even more damaging. She told the police that before she knocked on her daughter's door, she listened for a few minutes but did not hear anything. She then knocked on the door. She heard the defendant say, "The mice are outhang on a minute." She then banged on the door. She did not see the mice out and did not think he had time to put them away. Her daughter looked as if she had been caught doing something wrong. She therefore took her to another room, where the daughter first made the accusations.
The mother's friend also testified at trial. She, too, heard the girl say that the defendant "made me suck his privates." But she recalled that the mother, after visiting the defendant in prison, "said that the only way he is going to get out of jail is *209 if I take my story back." She overheard the mother "yelling at her [daughter], telling her, you know, `You have to tell the truth. . . . If you are lying to me, I'm going to beat you.'" According to the friend, the girl was "upset" and "[i]t was not a good situation." Later that night, the girl suddenly recanted. The friend allegedly spoke with the girl about this recantation:
I told her, "If you are doing this for attention I'm not going to get mad at you, I'm not going to yell at you, we just need to know. Because if [the defendant] didn't do it, [he] can't be sitting in jail, it's not right." And she says, "But it happened." And I said, "Then why are you saying?""Well, mommy wants to say it didn't happen."
(Emphases added.) The mother subsequently evicted the friend from the house. Despite this falling out, the friend admitted that she did not go to the authorities to report her conversation with the girl, who denied that it ever happened.
Finally, a fellow prisoner of the defendant's testified. He allegedly overheard the defendant in the visitation room saying: "You got to get the little girl to recamp [sic] her story because I'm looking at life in prison." He advised the defendant not to "mess[] around with a witness because child protection can remove that child from the home," to which the defendant responded, "there is no way they can do that." He also overheard a phone conversation in which the defendant said that "all you have to say is you gave the little girl a bath or whatever and when I came home from work you gave me the same towel." The prisoner admitted that he was on sex offender probation and that he was "hoping" his testimony in this case would improve his situation, although the State made clear it would not.
The majority takes a divide-and-conquer approach to this evidence, explaining why each isolated piece does "not actually `corroborate' the recanted out-of-court statements." Majority op. at 205 (quoting Davis v. State, 90 So.2d 629, 631 (Fla. 1956)). I acknowledge that, as the district court said, each piece of circumstantial evidence, viewed "individually, would fail as sufficient corroboration of [the defendant's] guilt." Baugh, 862 So.2d at 766. The relevant question, however, is whether the evidence cumulatively demonstrates the defendant's guilt, not whether any individual piece does. The majority opts for a divide-and-conquer approach because it wants to avoid "pyramiding assumption upon assumption." Majority op. at 205 (quoting Gustine v. State, 86 Fla. 24, 97 So. 207, 208 (1923)). This case, however, presents only two levels of evidence. At the base of the "pyramid" is a solid piece of direct evidence: the victim's detailed allegations of sexual abuse. Each piece of corroborating evidence relates directly to those allegations, making it unnecessary to stack assumptions.
While the corroborating evidence in this case may not independently prove the defendant's guilt, it strongly supports the child's allegations of sexual abuse. The mother found the child and the defendant in a suspicious situation, after which the child made accusations of sexual abuse and the defendant yelled, believably, that he wanted the child to perform fellatio on him. The defendant then tried to kill himself. The majority dismisses this evidence because the defendant was psychologically "troubled" and may have merely "thought[] about committing sexual battery," without ever actually doing it. Majority op. at 204. But that is where the girl's accusations come in. She gave graphic and detailed descriptions of sexual abuse to multiple people over multiple weeks, explaining how the defendant taught her to perform fellatio, what it was *210 like, how many times she had performed it, and how the defendant normally initiated their encounters. The credibility of these statementswhich, again, is an issue for the juryis substantially strengthened by the manner in which the defendant conducted himself after being discovered wearing only a towel in the girl's locked bedroom. He behaved as a guilty person would. Indeed, the mother believed he was guilty, as illustrated by the fact that she changed the house rules regarding nudity and door-locking.
The evidence also strongly suggests that the girl was pressured into recanting her accusations. Both a family friend and a fellow inmate of the defendant's testified that they heard vehement statements from the mother and the defendantabout the need to persuade the girl to recant. The friend even heard the mother threaten to "beat" the child if she did not tell the truth. The majority dismisses this testimony because neither the mother nor the defendant explicitly expressed a desire for the child to lie, majority op. at 204-05, and because the family friend had "damaged" credibility. Id. n. 6. Credibility, though, is a jury issue. Moreover, I cannot imagine that two adults trying to cover up sexual abuse would be so foolish as to state directly, in public, that they wanted the victim to lie. Although I concede that their statements could be interpreted as sincere expressions of a desire for the truth, they must be considered in light of what the victim herself said. She told a family friend after her recantation that "it happened" but that "mommy wants to say it didn't happen." The jury believed the friend's testimony, and the record contains corroborative evidence (i.e., the overheard comments by the mother and the defendant) that confirms what the girl said. We have no business questioning that credibility decision.
Like the district court, I acknowledge that this is a close case. Viewing the evidence in the light most favorable to the State, however, as the majority concedes we must, see majority op. at 204, I see no basis for overturning the jury's verdict. The child's shocking description of the incident established the elements of the offense; and though it was insufficient by itself to convict the defendant, the other evidence introduced clearly corroborated the child's story. Combined with her statements, the evidence was sufficient to submit the case to the jury, whose job it was to sort out the conflicting stories and the credibility issues.
I worry that, by deeming the evidence in this case insufficient, the majority will make it virtually impossible to convict sexual offenders whenever the victim recants and no physical evidence is available. This happens with disturbing frequency in child sexual abuse cases. Many such crimes occur without witnesses or physical evidence. It is the child's word against the adult's. Many, if not most, child victims are abused by family or close friends. Often, the family will be torn apart if the defendant must spend the rest of his life in prison. Enormous pressure is placed on the child to recant. It is asking for the superhuman to demand that an abused child, lacking corroborating eyewitnesses or physical evidence, persist in her accusations in the face of constant pressure from a sexually abusive adult and an enabling partner (sometimes even a parent).
Of course, some recantations are voluntary and sincere. But the very purpose of juries is to distinguish between the true and the false, between the sincere and the coerced. With no way to view the demeanor of the witnesses during their testimony, appellate courts are poorly equipped for that role. In cases such as this, where corroborating evidence strongly supports *211 the child's original accusations of sexual abuse and also points toward a forced recantation, we should leave to the jury the responsibility for evaluating witness credibility and arriving at the truth.
Because the majority takes this close case away from the jury, and usurps the jury's factfinding function in making credibility determinations, I respectfully dissent.
ANSTEAD and BELL, JJ., concur.
NOTES
[1] This family friend moved into Rachel's house shortly after the incident in January. The friend remained there until mid-March when she and Rachel had a falling out. Their friendship terminated in a "heated breakup" and Rachel threw the friend out of the house at that time.
[2] The State also cross-appealed the trial court's decision to instruct the jury to consider the child hearsay testimony as impeachment rather than as direct evidence. The Second District concluded that the trial court erred in giving the instruction, but that the State's cross-appeal was moot in light of the district court's decision to affirm Baugh's conviction. Id. at 757. Baugh filed a motion for rehearing, alleging that the district court had piled inference upon inference to conclude that the corroborative evidence was sufficient to sustain his conviction. The Second District denied Baugh's motion for rehearing.
[3] In out-of-court statements made by the child in a videotaped interview, the child claimed that Beber placed his mouth on the child's penis. At trial, the child testified that Beber only touched the child's penis with his hand. See Beber v. State, 887 So.2d 1248, 1252 (Fla. 2004).
[4] The statutory definition of sexual battery includes the "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object." § 794.011(1)(h), Fla. Stat. (2001).
[5] "Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue. Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist." Davis v. State, 90 So.2d 629, 631 (Fla.1956).
[6] As the district court noted, the credibility of this former friend was "damaged." Baugh, 862 So.2d at 761. C.P. testified that she did not like this person and never told her anything about the incident. Additionally, the friend admitted on cross-examination that she suspected Rachel was pressuring C.P. to change her story in late February, but never gave this information to the police or the prosecutor until she was approached by a detective on April 2. In fact, the friend admitted that she had no intention of telling the police or the prosecutor anything and would not have done so if she had not been approached by the detective.
[7] Florida recognizes a hearsay exception for statements by a child victim regarding sexual abuse, provided that "the circumstances of the statement provide sufficient safeguards of reliability" and certain other requirements are met. § 90.803(23)(a)(1)., Fla. Stat. (2005). The trial court instructed the jury that the victim's statements were not admissible as substantive evidence, a ruling that the State cross-appealed. Given the district court's resolution of the case, it deemed it unnecessary to address the State's cross-appeal. Baugh, 862 So.2d at 767. The majority apparently agrees with the State that the evidence was admissible as substantive evidence. See majority op. at 203.