WARNER, J.
Appellant was charged, tried, and convicted of the crime of leaving the scene of a crash involving injury to or death of a person.[1] He claims that the trial court *935 erred in denying his motion for judgment of acquittal because the state failed to prove that he knew or should have known that he hit a pedestrian. Based upon the totality of the circumstances and the unusual facts of this case, we agree and reverse.
At trial the following evidence was presented. Around 8:20 a.m. on the morning of November 3, 2010, a road ranger[2] patrolled 1-595 east of 1-95 in Broward County. He described the night as very dark. He noticed a couple of cars swerve around something in the middle of the westbound lanes of the highway. When he got close to the object, he realized that a person was standing in the middle lane of traffic. The person, a woman, appeared to be bending down to pick up something.
It was later learned that the woman, who was disabled with dementia, had been reported missing from her home the day before. Somehow she had wandered onto 1-595 in the early morning hours. She was African-American with a dark complexion, and she was wearing camouflage pants and a green shirt.
The road ranger immediately pulled off the road onto the shoulder just beyond where he saw the woman. He turned on his flashers and started screaming at her to get her attention. As he did so, he saw a car approaching in his rearview mirrors, coming from 1-95 southbound onto 1-595 westbound. Just as he made eye contact with her, she was hit by the vehicle and flew into the air. The road ranger could see the vehicle, which he described as a white sedan, leaving the scene and moving from the middle lane, where it had struck the woman, to the far left lane.
The road ranger did not see any other vehicles hit the woman, because he stated that he went into shock and did not see anything else. He testified, “I just went in shock, I could not believe that I seen [sic] a person flying in the air the way that person fly.” The road ranger did not see an eighteen-wheel tractor trailer rig run over the woman, although the driver stopped. When later questioned by the investigating highway patrol officer, the tractor-trailer driver said that he thought he had hit an animal. The road ranger eventually maneuvered his truck into the roadway to try to protect the woman’s body from further oncoming traffic.
At about the same time, appellant was driving west on 1-595. He had finished his shift at work, stopped by his girlfriend’s apartment to watch a movie, and was driving to his home in Plantation. He was driving a grey Dodge minivan. Around 3:40 a.m. he texted his girlfriend: “On 95 a truck fell off the back of a truck and wrecked the front passenger side of my car and went through the windshield. It didnt stop, so neither did i. Im shaken up as shit.” Later, his girlfriend testified that he told her that he thought a “piece of wood or something” had fallen off the back of a truck and hit his car.
It is significant that, at trial, the road ranger identified a picture of a white sedan as the type of vehicle that he saw strike the victim. He was also shown pictures of appellant’s grey Dodge minivan and testified that it was not the vehicle that he saw hit the victim.
Corporal Victor Luquis, a Florida Highway Patrol traffic homicide investigator, arrived on the scene of the accident around 4 a.m. He interviewed the road ranger and learned that the vehicle which *936 had struck the woman had left the scene. The officer saw debris in the road and observed the eighteen-wheel tractor trailer parked on the right shoulder of westbound 1-595. There was no front-end damage to the eighteen-wheeler, and Corporal Luquis did not see blood splatter on it. He determined that the woman was on the ground when the eighteen-wheeler ran over her and that her body had been dragged.
As he was investigating, he received a call from his communications center relaying an anonymous 911 call. The caller reported seeing a white Lexus hit a person on 1-595 and exit on University Boulevard, where the caller saw the driver remove his license tag. The call had been inadvertently dropped by the 911 dispatcher, so no further information was available. Nevertheless, the corporal did put out a BOLO (a “be on the lookout” alert) for such a vehicle. He did not make any investigation of the debris at the scene to determine whether it came from a Lexus or similar white sedan.
The on-scene investigation continued for over three hours. Around the time Corporal Luquis was wrapping up at the scene, he received a call that appellant’s father, a captain with the City of Plantation Police, had reported that his son’s vehicle may have been in an accident involving a pedestrian on 1-595. Corporal Luquis went to appellant’s residence and observed his Dodge minivan. Visually, he thought that the glass debris he had gathered from the scene looked like it was from the same headlight as appellant’s vehicle. The passenger side of the windshield had a gaping hole in it with spider fractures covering the entire passenger side. The right headlamp was destroyed. By this time it was daylight, and the corporal could see strands of hair and dried blood in the window of the van. He took photos of the minivan, took samples of the blood and hair, and had the vehicle transported as evidence. DNA tests confirmed that the blood and hair were that of the female victim. No further examination or inspection was made of appellant’s car or the debris found at the scene.
The corporal did make some investigation of the 911 caller who reported seeing the white Lexus hit the pedestrian. This information fit the description of the vehicle provided by the road ranger at the scene. The corporal examined the evidence of that call but was unable to locate that caller. He admitted he did not include the 911 call about the Lexus in his report. He ruled out the Lexus being involved in this incident because he could not find it, and because the caller had reported seeing a white male when the victim was an African-American female. Furthermore, the DNA match of the victim’s blood on appellant’s vehicle and damage to it convinced him that it was the “primary vehicle” in the incident. He admitted, however, that it would be possible for a small car going 71 miles an hour to hit a person and have the person clear the smaller car and land on the car behind it.
The corporal decided on his own not to pursue the investigation of the Lexus, without disclosing the information in his report or in the probable cause affidavit. The state was unaware of this information at the time appellant was arrested ten months after the accident. It was not until two weeks before trial was set that Corporal Luquis disclosed the evidence about the Lexus to the state and defense.[3]
*937 The medical examiner determined that the cause of the victim’s death was “multiple blunt force trauma.” This included the severance of some of her limbs. The examiner could not tell, however, which impact killed the victim.
After the state rested, the defense moved for a judgment of acquittal on the grounds that the state had failed to prove both that the crash involving appellant’s vehicle resulted in injury or death to the victim and that the defendant knew or should have known that he hit a person. The court denied the motion.
The defense called appellant’s father as a witness. He testified that, the morning after the accident, appellant told his father that he had hit something coming home and the car was damaged. They went outside to look at the vehicle. Based upon the father’s law enforcement training and experience, he noticed what appeared to be hair on the windshield and, on the right front lower portion of the passenger side fender, a smear of blood. When he told his son that he may have hit a pedestrian, appellant nearly fainted. The father immediately called the Florida Highway Patrol, which resulted in Corporal Luquis arriving at the house to examine the vehicle.
The defense also presented a physicist who prepared a computer animation of the crash. Using all of the information gathered by the investigation and giving credit to the road ranger’s observation of the victim being hit by a sedan-type vehicle, the computer animation showed the victim being hit first by the sedan, being flipped up over the vehicle, hitting appellant’s vehicle, and then sliding down to the pavement. As such, the victim’s body, when airborne, was above the headlights so that appellant could not see her in the darkness. Notably, the physicist found it significant that appellant’s airbag did not deploy, which he says should have occurred had the victim been struck first by appellant’s headlight.
At the close of all the evidence, appellant renewed his motion for judgment of acquittal, which was again denied. After closing argument, the jury convicted appellant as charged, and appellant appeals his conviction.
Appellant argues that the trial court erred in denying his motion for judgment of acquittal because there was insufficient evidence to convict him of willfully leaving the scene of a crash resulting in death. A motion for judgment of acquittal is reviewed using the de novo standard. Pagan v. State, 830 So.2d 792, 808 (Fla.2002). If, after viewing the evidence in the light most favorable to the state, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. Id. Where, however, the evidence is entirely circumstantial, the evidence must be sufficient to prove each element of the crime but must also exclude the defendant’s reasonable hypothesis of innocence. Id. This heightened standard does not apply where the evidence is both direct and circumstantial, as it is in this case. Id.; see also Reynolds v. State, 934 So.2d 1128, 1147 (Fla.2006) (“[T]his Court need not apply the special standard of review applicable to circumstantial evidence cases because the State presented direct evidence in the form of DNA evidence and eyewitness testimony.”) (quoting Fitzpatrick v. State, 900 So.2d 495, 506 (Fla.2005)). Nevertheless, we conclude that the state failed to offer evidence sufficient to support an essential element of the crime, i.e., that appellant knew or should *938 have known that he hit a person, thus necessitating his duty to stop.
The crime of leaving the scene of a crash involving injuries or death, section 816.027, Florida Statutes (2010), requires proof of four elements:
(1) That the defendant was the driver of a vehicle involved in a crash resulting in injury to or death of any person;
(2) That the defendant knew or should have known that he was involved in a crash;
(3) That the defendant knew or should have known of the injury to or death of the person;
(4) That the defendant willfully failed to stop at the scene of the crash or as close to the crash as possible and remain there until he had given identifying information to the injured person, driver, occupant or person attending the vehicle and to any police officer investigating the crash.
See Fla. Std. Jury Instr. (Crim.) 28.4. In Booker v. State, 103 So.3d 1035, 1037 (Fla. 2d DCA 2012), the court explained the state’s burden in proving a violation of section 316.027 as follows:
To meet the intent requirement of the statute as written, it is not enough for the State to prove that the defendant was involved in a crash that resulted in injury or death, that the defendant knew or should have known that he was involved in a crash, and that the defendant willfully failed to stop at the scene. See State v. Mancuso, 652 So.2d 370, 371-72 (Fla.1995). Instead, the State must also “establish that the driver ‘either knew of the resulting injury or death or reasonably should have known from the nature of the accident.’ ” K.W. v. State, 78 So.3d 74, 75 (Fla. 2d DCA 2012) (quoting Mancuso, 652 So.2d at 372). Further, when there are multiple impacts, the driver must know of the specific impact that actually resulted in the injury. Id. at 76.
Appellant contends that the evidence never proved that he was involved in a crash resulting in the injury or death of a person because the state could not prove which impact caused injury or death. If the victim was killed on impact in the first crash and the first crash involved the white sedan, then the second crash with appellant’s vehicle would not have resulted in injury or death to a person, because the person was already dead. However, where there are multiple crashes, each might be a contributing cause to the injury or death of the victim. “[W]hen there are multiple impacts, the driver must know of the specific impact that actually resulted in the injury.” Booker, 103 So.3d at 1037; see also K.W., 78 So.3d at 76 (in reversing the conviction of a driver involved in a three vehicle accident, the court found that “[wjithout evidence regarding how the three vehicles impacted to cause the rollover, a jury could not determine from the nature of the impact that [the defendant] was aware that the crash caused injury.”).
We need not decide this issue, however, because we conclude that, even assuming that the crash in which appellant was involved resulted in the victim’s death, the evidence presented by the state simply failed to prove another element of the crime: that appellant knew or should have known that the accident involved a person.
The state’s evidence showed that the only eyewitness to the incident, the road ranger, identified a white sedan as hitting the victim, and the victim flew up into the air. He specifically noted that the Dodge minivan driven by appellant was not the vehicle that he saw hit the victim. The road ranger also mentioned how dark it was on the morning of the accident. He could not ascertain that a person was in the road at first. She was dressed in dark *939 clothing. A tractor trailer rig also ran over the victim, and the driver did not know that he hit a person.
No one saw appellant’s vehicle at the scene, and therefore no one saw appellant leave the scene. Appellant did text message his girlfriend and indicated that he had hit something on 1-595, the experience of which scared him. He thought it was a piece of lumber or other debris that had fallen off the back of a truck. He did not stop because the other vehicle did not stop.
There is no evidence in the state’s case establishing that appellant knew or should have known that he struck a person. No one would reasonably expect that a person would be in the middle lane of 1-595 in the early morning hours. There was no evidence that the victim should have been seen by the light of the vehicles or overhead lighting. If, as the state’s eyewitness described, the victim’s body flew up in the air, it would not have been illuminated in the light of oncoming vehicles, including appellant’s. This was also the finding of the defense’s expert physicist.
The state did not offer any accident reconstruction. The investigating officer found debris at the scene which appeared to be similar to the headlight of appellant’s vehicle. He did not look for evidence of any other vehicle. In his testimony at trial, he determined that, to explain the damage to appellant’s vehicle, appellant must have been travelling at a speed between 45 to 60 miles an hour, the lower end of which would be very slow for an interstate highway. Thus, he was starting with the premise that appellant’s vehicle was the first to strike the victim. This premise ignored the actual facts as reported by the eyewitness who saw the victim’s body fly through the air, as well as the consistent evidence from appellant himself through the text message to his girlfriend. At trial, the state placed emphasis on the hole in the windshield, which had the victim’s hair embedded in the glass, as evidence that appellant reasonably should have known that he had hit a person. Yet, there was no evidence as to whether the lighting conditions would have allowed appellant to see the victim’s head on the windshield. Nor was there any evidence as to how long the time period was in which appellant had an opportunity to see what hit his vehicle.
This case is similar to Booker, in which the court reversed a conviction for leaving the scene of an accident involving injuries because the state presented no evidence that the defendant knew or should have known that injury was a consequence of the crash. 103 So.3d at 1036. There, the defendant had crashed into a patrol car on the side of the road, where an officer had stopped to help a woman in a disabled vehicle. Id. Given the nature of the accident, where the defendant’s vehicle struck the patrol car and spun around, the court found no evidence that he could have known of any injuries to the woman in the disabled vehicle, which he struck with the back of his car as he spun. Id. at 1037-38. “[Ejven assuming that [the defendant] Booker should have been aware of the impact to [the victim] Alvarado’s car, nothing about the nature of that impact would establish that Booker either knew or should have known that the car was occupied or that Alvarado was injured. In the absence of such evidence, the trial court should have granted Booker’s motion for judgment of acquittal on this charge.” Id. at 1038.
Where the state has failed to prove each element of a crime beyond a reasonable doubt, the case should not be submitted to the jury. See Baugh v. State, 961 So.2d 198, 204 (Fla.2007). “There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the *940 elements of the crime beyond a reasonable doubt.” Id. Here, the state’s evidence fell considerably short of this mark. We conclude that it did not prove with any competent evidence that appellant knew or should have known that he struck a person on 1-595 in the early morning hours in the dark, let alone that “the crash” resulted in death or injury to a person. Without proof of all the elements of the crime, the trial court should have granted a judgment of acquittal.

Reversed with directions to discharge the defendant.

FORST and KLINGENSMITH, JJ., concur.

. He was sentenced to two years of community control followed by eight years of proba *935 tion. His driver's license was also permanently revoked.

. Road rangers are employed to assist persons involved in accidents or who have car trouble on the state highways, to allow the roadways to stay clear of obstructions.

. Appellant also raised a Brady violation as an issue on appeal, claiming that he should have been entitled to dismissal of the charge because of the corporal’s failure to disclose the evidence. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court found that a Brady violation had occurred but denied dismissal of the charge. We need not determine whether the trial court erred in not dismissing the charge *937 for this violation because of our determination that the state failed to prove its case.