# Third District Court of Appeal

## State of Florida

Opinion filed April 26, 2023.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D15-2815
Lower Tribunal No. F14-22311

————————————

**John Garcia,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Stephen T. Millan, Judge.

Carlos J. Martinez, Public Defender, and Susan S. Lerner, Assistant Public Defender, for appellant.

Ashley Moody, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for appellee.


Before EMAS, SCALES and HENDON, JJ.

SCALES, J.

This case is on remand from the Florida Supreme Court for reconsideration in light of Bush v. State, 295 So. 3d 179 (Fla. 2020). See State v. Garcia, 338 So. 3d 847, 848 (Fla. 2022) ("Garcia II"). In Garcia v. State, 276 So. 3d 860 (Fla. 3d DCA 2019) ("Garcia I"), this Court (i) reduced John Garcia's conviction for second-degree grand theft to third-degree grand theft, and (ii) reversed Mr. Garcia's conviction for second-degree murder and directed the lower court to enter an order of acquittal on the charge. Importantly, in reaching its decision on Mr. Garcia's second-degree murder conviction, this Court applied the now-abandoned special standard of appellate review for purely circumstantial evidence cases ("special standard").[1] While Garcia I was pending review in the Florida Supreme Court, however, our high court eliminated this special standard, so that, on remand, our review is now limited to whether the State presented competent, substantial evidence to support the jury's verdict. See Bush, 295 So. 3d at 200. Consequently, in Garcia II, the Florida Supreme Court quashed Garcia I and "remand[ed] with instructions that the Third District reconsider Mr.

---

[1] Under this now-abandoned special standard, in addition to determining whether Mr. Garcia's guilty verdict was supported by competent, substantial evidence regarding each element of the charged crime, we were required to determine "whether the State presented competent evidence from which the jury could infer [Mr. Garcia's] guilt for the crime charged to the exclusion of all reasonable hypotheses of innocence." Garcia I, 276 So. 3d at 866.

Garcia's appeal applying the competent, substantial evidence standard of Bush." Garcia II, 338 So. 3d at 848.

With regard to Mr. Garcia's theft conviction – to which we did not apply the now-abandoned special standard in Garcia I – we are again compelled to reduce Mr. Garcia's conviction for second-degree grand theft to third-degree grand theft because the State failed to present competent, substantial evidence that the value of the property Mr. Garcia stole from the victim, Larissa Macriello, met the $20,000 threshold for second-degree grand theft. With regard to Mr. Garcia's conviction for second-degree murder – to which we did, in Garcia I, apply the now-abandoned special standard – we conclude, under the Bush standard, that the State failed to present competent, substantial evidence below that Ms. Macriello died through the criminal agency of Mr. Garcia. Hence, we are again compelled to reverse Mr. Garcia's conviction on this count, and remand to the lower court with directions to enter an order of acquittal on the charge. We do, however, certify to the Florida Supreme Court a question of great public importance regarding the continued viability, in light of Bush, of the general prohibition against the pyramiding of inferences.

## I.  RELEVANT FACTS AND PROCEDURAL HISTORY

*A. Relevant Background*

3

In 1999, Larissa Macriello relocated to the United States from Panama. Over the years, she lived in Rhode Island, Maryland, North Carolina and Florida. In the summer of 2009, Ms. Macriello moved to Jacksonville Beach, Florida to live with her brother, Roderik Mokillo. In early 2011, she moved to Miami. In early June 2013, Ms. Macriello disappeared suddenly and without a trace.

Ms. Macriello was close to her family, staying in frequent contact with her mother and siblings via telephone, email, text message and social media. She last communicated with her brother, Mr. Mokillo, via text message in late May of 2013, over Memorial Day weekend. She last spoke to her mother on the telephone on June 1, 2013.

Ms. Macriello's landlord last saw and spoke to Ms. Macriello on June 3, 2013. Ms. Macriello told the landlord that she was waiting for her passport to arrive so that she could return to Panama to visit her mother. On June 10, 2013, between noon and 2 p.m., the landlord heard Ms. Macriello's car being parked in Ms. Macriello's usual parking spot in front of her apartment building. The landlord did not, however, see the individual who drove the car. That same day, June 10, 2013, around noon, a taxi driver picked up the defendant, John Garcia, and an unknown woman (not Ms. Macriello) from a convenience store located several blocks from Ms. Macriello's residence.

4

After Ms. Macriello failed to respond to text messages, or to answer or return telephone calls, Mr. Mokillo traveled to Miami on June 18, 2013, to file a missing person report. That same day, with the assistance of the landlord, officers from the Miami-Dade County Police Department ("MDPD") gained access to Ms. Macriello's apartment to conduct a check on Ms. Macriello's welfare. Ms. Macriello was not inside the apartment. The police walk-through of the apartment revealed no signs of a struggle, and nothing out of the ordinary. The police did not see her purse, laptop computer, cellphone or car keys in the apartment; these items were never found. The officers observed Ms. Macriello's car in the parking space outside the apartment building, but did not search it beyond confirming that Ms. Macriello was not inside it. The officers' subsequent calls to hospitals and jails in Miami-Dade and Broward counties revealed no information on Ms. Macriello's whereabouts.

Ms. Macriello had a checking and a savings account with Bank of America ("BOA"). Although Ms. Macriello's brother, Mr. Mokillo, was not an authorized user on the BOA accounts, he was listed as the beneficiary on the accounts. Mr. Mokillo visited a BOA bank branch and was able to learn, generally, that withdrawals were being made out of her accounts in large amounts. Mr. Mokillo relayed this information to the police, who subpoenaed Ms. Macriello's BOA account records.

The BOA account records revealed that, around the date of Ms. Macriello's disappearance (June 3, 2013), there was approximately $24,000 in her BOA checking account and $23,000 in her BOA savings account. Beginning on June 5, 2013, and going through August 15, 2013, however, the bulk of her BOA account balances was drained through a series of transactions, all to the benefit of Mr. Garcia – specifically: (i) on June 5 and 12, 2013, Mr. Garcia made two ATM withdrawals from Ms. Macriello's BOA savings account,[2] using her ATM card and personal identification number ("PIN"); (ii) Mr. Garcia deposited two $20,000 personal checks (dated June 5 and 10, 2013, respectively), written by Ms. Macriello to Mr. Garcia, into his own BOA checking account; and (iii) multiple online transfers were made from Ms. Macriello's BOA checking account to Mr. Garcia's BOA checking account totaling $4,700.[3] Cumulatively, these transactions depleted Ms. Macriello's BOA accounts.

The police subpoenaed the cellphone records for Ms. Macriello's and Mr. Garcia's cellphone accounts, learning that there were frequent calls

---

[2] BOA surveillance video and still pictures from the BOA ATM evidenced Mr. Garcia making these two ATM withdrawals, the first of which Mr. Garcia made at a BOA drive-up ATM while driving Ms. Macriello's vehicle.

[3] The BOA records custodian testified that the following online transfers were made: $1,000 on June 5, 2013; $1,000 on June 26, 2013; $1,000 on July 5, 2013; $1,000 on July 17, 2013; and $700 on August 5, 2013.

between Mr. Garcia's and Ms. Macriello's cellphones between the time Ms. Macriello was last seen (June 3, 2013) and when her cellphone was shut off (July 7, 2013). Other than calling voicemail, Ms. Macriello's cellphone made no outgoing calls to anyone other than Mr. Garcia. Moreover, during this timeframe, numerous calls between Mr. Garcia's cellphone and Ms. Macriello's cellphone "pinged" off the same cellular antenna, within the same sector, indicating that the cellphones were within close proximity to each other at the time of the calls.

During their investigation, the police learned from Ms. Macriello's sister that Ms. Macriello had obtained a second cellphone number in late May 2013, just days before Ms. Macriello's disappearance. The second cellphone was never recovered. While MDPD requested the cellphone records for the second cellphone number from the cellphone carrier, MDPD never received the records. Mr. Garcia's cellphone records, though, reflected incoming calls from Ms. Macriello's second cellphone number on June 4, 2013, and June 7, 2013.

When MDPD crime scene investigators ("CSI") processed and inspected Ms. Macriello's vehicle in mid-July 2013, they found that her car was unlocked, smelled of cleaning agents, and was thoroughly clean inside. The driver's seat was positioned further back to accommodate a driver taller

than Ms. Macriello. CSI sprayed the interior of the vehicle with luminol, which reacts to hemoglobin in blood. The luminol reacted to a fluid in the trunk (possibly detecting the outline of a purse) and to a fluid on the front passenger floorboard (possibly detecting the outline of a hammer). The affected area was removed and tested, but the results came back negative for blood, and the fluid to which the luminol reacted remains unknown. CSI found two strands of Mr. Garcia's hair in the vehicle interior, and one DNA sample matching Mr. Garcia on the car's center console. CSI also found a mixture of DNA on the vehicle's steering wheel; Ms. Macriello's DNA was included in the mixture.

In October 2014, Mr. Garcia voluntarily went to the police station to discuss Ms. Macriello's disappearance with an MDPD homicide detective. In the interview, Mr. Garcia stated that he met Ms. Macriello on a dating website. He admitted to having an ongoing sexual relationship with Ms. Macriello. Mr. Garcia's wife did not know Ms. Macriello or that Mr. Garcia had a relationship with her. Mr. Garcia claimed that he had last seen Ms. Macriello sometime between July 4 and August 2013.

Mr. Garcia told the MDPD homicide detective that he had loaned money to Ms. Macriello on occasion; but, Mr. Garcia did not tell the detective about a specific loan to Ms. Macriello where she had executed a promissory

8

note memorializing a $20,000 loan from him to her. Mr. Garcia made two demonstratively false statements to the detective: (i) Mr. Garcia denied having any access to, or taking any money from, Ms. Macriello's BOA accounts; and (ii) Mr. Garcia stated that he had only been in Ms. Macriello's car as a passenger.

During the taped police interview, Mr. Garcia's wife confronted Mr. Garcia, and Mr. Garcia told his wife that he and Ms. Macriello were "just friends"; he denied to his wife that he ever had sex with Ms. Macriello. Mr. Garcia initially denied receiving any money from Ms. Macriello, but later admitted to his wife that Ms. Macriello had given him two $20,000 checks because Ms. Macriello owed him money.[4] Mr. Garcia told his wife that he did not kill Ms. Macriello and that Ms. Macriello would show up some day. The police arrested Mr. Garcia that same day.

*B. The Underlying Trial Court Proceedings*

The State charged Mr. Garcia by information with the first-degree premeditated murder of Ms. Macriello, and one count of second-degree

---

[4] A warranted search of Mr. Garcia's home revealed a handwritten promissory note, purportedly in Ms. Macriello's handwriting, that was found in the back of a filing cabinet drawer. This note purported to evidence that Mr. Garcia had loaned Ms. Macriello $20,000. During this search, the police also found two firearms in Mr. Garcia's home. See footnote 5, *infra*.

9

grand theft. A Florida grand jury also indicted Mr. Garcia on these charges.[5]

The case went to trial in November 2015.

At trial, the State theorized that, on June 4, 2013, Mr. Garcia killed Ms. Macriello in order to steal the money in her BOA savings and checking accounts. At the close of the State's case, the defense moved for a judgment of acquittal as to the first-degree murder and second-degree grand theft charges, arguing, in part, that the State had failed to present evidence to rebut Mr. Garcia's reasonable hypotheses of innocence to the charges. The trial court denied Mr. Garcia's motion.

The jury found Mr. Garcia guilty of second-degree murder, a lesser included offense of first-degree premeditated murder. The jury also found Mr. Garcia guilty of second-degree grand theft, finding that the value of the stolen property was "$20,000 or more but less than $100,000." The trial court sentenced Mr. Garcia to life in prison for second-degree murder and to fifteen

---

[5] The State also charged Mr. Garcia with, and indicted him for, two counts of possession of a firearm by a convicted felon. These two counts were eventually severed and Mr. Garcia pled guilty to both counts, reserving his right to challenge the legality of the search on appeal. The trial court sentenced Mr. Garcia to fifteen years in prison on each count of possession of a firearm by a convicted felon, to run consecutively. The trial court later vacated one of the firearm possession sentences. This Court affirmed Mr. Garcia's conviction for one count of possession of a firearm and the fifteen-year sentence thereon. See Garcia v. State, 225 So. 3d 820 (Fla. 3d DCA 2017).

10

years in prison for second-degree grand theft, with both sentences to run consecutively. Mr. Garcia timely appealed his convictions and sentences to this Court.

### C. Appellate Proceedings in *Garcia I* and *Garcia II*

In his plenary appeal to this Court, Mr. Garcia argued that the trial court had erred by denying his motion for judgment of acquittal as to the charges of first-degree murder and second-degree grand theft. Garcia I, 276 So. 3d at 867, 870. With regard to Mr. Garcia's theft conviction, we concluded that, while the State had presented competent, substantial evidence from which a jury could conclude that Mr. Garcia's two $500 ATM withdrawals from Ms. Macriello's BOA savings account constituted theft, there was no competent, substantial evidence that supported the State's allegations that the other transactions constituted theft. Garcia I, 276 So. 3d at 867-68. Hence, this Court reduced Mr. Garcia's second-degree grand theft conviction to third-degree grand theft. Id. at 870. To Mr. Garcia's murder conviction, we applied the then-appropriate special standard, and reversed the conviction, concluding that the "the State failed to adduce sufficient, competent evidence to rebut Mr. Garcia's reasonable hypothesis of innocence." Id.

Relying upon the then-recently decided Bush case, the Florida Supreme Court quashed Garcia I and remanded Mr. Garcia's appeal to this

11

Court for reconsideration in light of Bush's elimination of the special standard. Garcia II, 338 So. 3d at 848. We ordered supplemental briefing from the parties and heard renewed oral arguments. Pursuant to Garcia II's remand instructions, we now undertake a review of the trial court's denial of Mr. Garcia's motion for judgment of acquittal without regard to the special standard that was abandoned by our high court in Bush.

## II. STANDARD OF REVIEW

"When the defendant in a criminal appeal challenges the sufficiency of the State's evidence, the appellate court conducts a *de novo* review of the trial record to ensure that the guilty verdict is supported by competent, substantial evidence regarding each element of the charged crime." Rodriguez v. State, 335 So. 3d 168, 171 (Fla. 3d DCA 2021). In conducting its review of the record, the appellate court does not reweigh the evidence, but simply determines whether competent, substantial evidence has been presented by the State as to each element of the crime. See Durousseau v. State, 55 So. 3d 543, 556 (Fla. 2010). This standard of appellate review applies regardless of whether, at trial, the State presented only purely circumstantial evidence of guilt as to the charge crime. Bush, 295 So. 3d at 200-01. While a jury may draw reasonable inferences from the State's evidence to reach the conclusion of guilt, "evidence is insufficient to support

12

a conviction when it requires pyramiding of assumptions or impermissibly stacked inferences." Baugh v. State, 961 So. 2d 198, 205 (Fla. 2007).[6]

In moving for a judgment of acquittal, the defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the [State] that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974). "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). "The [trial court] should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the [State] can be sustained under the law." Lynch, 293 So. 2d at 45.

## III.   ANALYSIS

### A. Preservation for Appellate Review

We first address the State's claim that Mr. Garcia's motion for judgment of acquittal failed to adequately preserve Mr. Garcia's appellate argument that the State failed to establish each element of the crimes with competent, substantial evidence. The State's Supplemental Answer Brief on Remand

---

[6] See Section III. C. 1., *infra*.

13

contends that Mr. Garcia's motion for a judgment of acquittal on the theft and murder charges challenged only the State's failure to present evidence that was inconsistent with Mr. Garcia's reasonable hypotheses of innocence, neglecting to argue further that the State had failed to present competent, substantial evidence to support an element of the charged crimes.

Florida Rule of Criminal Procedure 3.380(b) requires a motion for judgment of acquittal to "fully set forth the grounds on which it is based." "[A] 'technical and pro-forma' motion which requests a judgment of acquittal without further argument is 'totally inadequate to preserve a sufficiency of the evidence claim for appellate review.'" Young v. State, 141 So. 3d 161, 165 (Fla. 2013) (quoting Brooks v. State, 762 So. 2d 879, 895 (Fla. 2000)). To preserve for appellate review Mr. Garcia's challenges to the sufficiency of the evidence presented below, he was required, in moving for judgment of acquittal at trial, to identify the element(s) of the second-degree grand theft and first-degree murder charges "for which he contended the evidence was lacking." Rodriguez, 335 So. 3d at 172; see also Bradwell v. State, 300 So. 3d 325, 328 (Fla. 1st DCA 2020) (noting, in purely circumstantial evidence cases, pre-Bush, that a claim the State failed to present legally sufficient evidence to establish each element of the charged crime was a "legally distinct issue[]" that must be raised below to preserve appellate review).

14

In moving below for a judgment of acquittal as to the first-degree murder charge, defense counsel argued initially that the State had failed to present evidence to rebut Mr. Garcia's reasonable hypothesis of innocence, pointing to the lack of any direct evidence that Ms. Macriello was dead, that her death was caused by Mr. Garcia, or that the killing was premeditated. Defense counsel, though, then went on to argue that there was "no conclusive evidence establishing the scene of a crime"; that there was "no conclusive evidence to support that [Ms. Macriello] is dead"; and that the State had presented no evidence to support its theory that Mr. Garcia had killed Ms. Macriello to steal her money. Defense counsel stated further that "those arguments that I made also apply to the grand theft."

On this record, we conclude that defense counsel adequately preserved for appellate review Mr. Garcia's challenges to the sufficiency of the evidence presented at trial as to both the murder and theft charges. See Rodriguez, 335 So. 3d at 173 ("While no magic words are needed to make a proper objection, the articulated concern must be sufficiently specific to inform the court of the perceived error." (quoting Murray v. State, 3 So. 3d 1108, 1117 (Fla. 2009) (internal quotations omitted))). We, therefore, now turn to the merits of Mr. Garcia's challenges to the sufficiency of the evidence presented at trial for both of the charges of which Mr. Garcia was convicted.

## B. The Second-Degree Grand Theft Conviction[7]

The jury convicted Mr. Garcia of second-degree grand theft, accepting the State's theory that Mr. Garcia, through a series of transactions occurring between June 4, 2013, and August 15, 2013, depleted $45,700 from Ms. Macriello's BOA savings and checking accounts. In moving below for a judgment of acquittal on the grand theft charge, defense counsel acknowledged that Mr. Garcia (i) deposited into his personal account two $20,000 personal checks drawn on Ms. Macriello's BOA's checking account, (ii) received a series of online transfers from Ms. Macriello's BOA checking account, totaling $4,700, and (iii) made two $500 ATM withdrawals from Ms. Macriello's BOA savings account. Rebutting the State's theory, defense

---

[7] The Florida Supreme Court's remand instructions require us to "reconsider Mr. Garcia's appeal applying the competent, substantial evidence standard of <u>Bush</u>" without regard to the special standard of appellate review that <u>Bush</u> abrogated. <u>Garcia II</u>, 338 So. 3d at 848. As we noted in <u>Garcia I</u>, though, with respect to our appellate review of the trial court's denial of Mr. Garcia's motion for judgment of acquittal regarding the grand theft charge, we did not apply the special standard. See <u>Garcia I</u>, 276 So. 3d at 869, n.13. Without applying the special standard, in <u>Garcia I</u> we concluded that "the State presented competent, substantial evidence that the value of the property Garcia stole from the victim, Larissa Macriello, was only $1,000." <u>Id.</u> at 862-63. Nevertheless, for the sake of clarity and because <u>Garcia II</u> quashed the entirety of <u>Garcia I</u> without differentiating between this Court's treatment of Mr. Garcia's theft and murder convictions, we review anew the State's evidence regarding Mr. Garcia's second-degree grand theft conviction under <u>Bush</u>'s competent, substantial evidence standard.

counsel argued that none of these transactions constituted "theft" because: (i) Ms. Macriello had written the two $20,000 checks to Mr. Garcia, one of which satisfied a personal loan that was memorialized in a promissory note; (ii) the State had presented no evidence that Mr. Garcia had initiated the $4,700 in online transfers; and (iii) Mr. Garcia had made the two $500 ATM withdrawals with Ms. Macriello's consent, as evidenced by Mr. Garcia having Ms. Macriello's PIN.

Section 812.014(1) of the Florida Statutes (2013), Florida's theft statute, provides:

> (1) A person commits theft if he or she knowingly obtains or uses,[8] or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

---

[8] Section 812.012(3) of the Florida Statutes (2013) defines "obtains or uses" as any manner of:

(a) Taking or exercising control over property.

(b) Making any unauthorized use, disposition, or transfer of property.

(c) Obtaining property by fraud, willful misrepresentation of a future act, or false promise.

(d)1. Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or

2. Other conduct similar in nature.

17

(a) Deprive the other person of a right to the property or a benefit from the property.

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Hence, for each of the transactions that the State alleged constituted Mr. Garcia's theft of Ms. Macriello's funds, the State was required to establish, with competent, substantial evidence, that Mr. Garcia knowingly obtained Ms. Macriello's property with the specific intent either to deprive Ms. Macriello of her right to the property or to appropriate the property to his own use. We now analyze each transaction to determine whether the jury's verdict finding Mr. Garcia guilty of second-degree grand theft was supported by competent, substantial evidence.

1. The two $20,000 personal checks from Ms. Macriello to Mr. Garcia

Mr. Garcia deposited two $20,000 checks – ostensibly signed by Ms. Macriello, and made payable to him – into his own BOA checking account. The State posited below that Mr. Garcia had somehow coerced Ms. Macriello into writing and signing the two $20,000 personal checks by placing her under duress, or, alternatively, that Mr. Garcia had forged Ms. Macriello's

signature on the checks. The State, however, presented no evidence to support its theory.[9]

The State's forensic document examiner testified that she compared BOA machine copies of the two personal checks to known handwriting samples of Ms. Macriello. Based on her comparisons, the forensic document examiner opined that the two checks were "probably written by Larissa D. Macriello." The memo line of the check dated June 5, 2013, read "Repay Loan #1." The memo line of the check dated June 10, 2013, read "#2." The forensic document examiner also testified that she examined the original, handwritten promissory note purportedly evidencing that Ms. Macriello owed $20,000 to Mr. Garcia. Based on her comparison of the promissory note to Ms. Macriello's known handwriting samples, the forensic document examiner testified that she was "able to identify Larissa D. Macriello as the writer of that note." When asked by the State whether the forensic document examiner was able to determine whether a document was written under "any kind of pressure" or "duress," the forensic document examiner answered each time, unequivocally, "No."

---

[9] Notably, the State did not argue this theory to the jury during closing argument.

Hence, the State presented no evidence that Mr. Garcia somehow coerced Ms. Macriello into writing the two $20,000 personal checks or the promissory note, or that Mr. Garcia had forged Ms. Macriello's signature on the documents. Without any evidence of forgery or coercion, the State's evidence establishes nothing more than Mr. Garcia's depositing of checks that were made payable to him. Thus, as we did in Garcia I, we conclude that the State failed to present competent, substantial evidence that Mr. Garcia knowingly obtained Ms. Macriello's property ($40,000) with the specific intent either to deprive Ms. Macriello of her right to the property or to appropriate the property to his own use. See § 812.014(1), Fla. Stat. (2013).

2. The $4,700 in online transfers from Ms. Macriello's BOA checking account

With regard to the series of online transfers,[10] the State maintained below that Mr. Garcia stole money from Ms. Macriello's BOA checking account by making the numerous online transfers (between June 5, 2013 and August 15, 2013) from Ms. Macriello's BOA checking account to Mr. Garcia's BOA checking account. The State, however, presented no evidence at trial to support this theory.

---

[10] See footnote 3, *supra*.

BOA's records custodian testified that BOA has the capability of determining the origin of an online transfer – i.e., the geographic location of, and the specific computer from whence, the electronic funds transfer originated – by looking at the internet protocol ("IP") address associated with a particular online transaction. The BOA records custodian testified though, that to his knowledge, MDPD never made an IP address request for the subject online transactions.[11] Because BOA did not process such a search request, the IP address(es) – and origin information – for the online transactions are unknown.

The State presented no evidence that Mr. Garcia ever possessed, or had access to, Ms. Macriello's laptop computer, or that Ms. Macriello stored the username and password for her BOA accounts on the laptop computer. MDPD never recovered Ms. Macriello's laptop computer after her disappearance. The State also presented no evidence that Mr. Garcia had learned Ms. Macriello's username and password through other means,[12] nor

---

[11] The MDPD homicide detective testified that the IP addresses for the subject online transactions were subpoenaed from BOA, but BOA never complied with the subpoena.

[12] We note that Mr. Garcia's possession of Ms. Macriello's ATM card and PIN did not establish that Mr. Garcia knew the username or password for Ms. Macriello's BOA accounts such that Mr. Garcia could initiate the online transfers.

21

did the State adduce any evidence of Mr. Garcia's use of his own personal computer with respect to the subject online transactions. In short, there was no evidence presented to the jury that the online transfers were initiated by Mr. Garcia.

Given this lack of evidence, the State was unable to posit to the jury any explanation for how Mr. Garcia allegedly accomplished the online transactions in this case. Indeed, during the State's closing argument, the prosecutor commented:

> Now, we all know you have to have security codes to do these kinds of transfers. He got Larissa's security code somehow. I can't tell you how. I can't tell you how. Even her family didn't have them. Even her family didn't have them. He got them somehow.

Thus, we are compelled to conclude, as we did in Garcia I, that the State failed to present competent, substantial evidence that Mr. Garcia knowingly obtained, through online banking transactions, Ms. Macriello's property ($4,700) with the specific intent either to deprive Ms. Macriello of her right to the property or to appropriate the property to his own use.[13] See § 812.014(1), Fla. Stat. (2013).

---

[13] We are cognizant that theft can be charged where there is a knowing and intentional possession of recently stolen property. See § 812.014(1), Fla. Stat. (2013); § 812.022(2), Fla. Stat. (2013); Smith v. State, 742 So. 2d 352, 354-55 (Fla. 5th DCA 1999). The State, however, did not charge or indict Mr. Garcia in this manner, nor was the jury instructed thereon.

3. The two $500 ATM withdrawals from Ms. Macriello's BOA savings account

With regard to the two $500 ATM withdrawals, we reach a different conclusion because the State was able to establish that Mr. Garcia took Ms. Macriello's funds, and the State also presented sufficient evidence for the jury to conclude that Mr. Garcia did so without Ms. Macriello's consent.

The State introduced, through the BOA records custodian, surveillance video, still pictures and transaction records evidencing that: (i) on June 5, 2013, at 3:56 p.m., while driving Ms. Macriello's vehicle, Mr. Garcia used Ms. Macriello's ATM card and PIN to withdraw $500 from her BOA savings account at a BOA drive-up ATM located in Brownsville; and (ii) on June 12, 2013, at 4:05 p.m., Mr. Garcia used Ms. Macriello's ATM card and PIN to withdraw $500 from her BOA savings account at a BOA walk-up ATM located in North Miami Beach.  Thus, the State presented direct evidence that Mr. Garcia had knowingly obtained Ms. Macriello's property – i.e., the $1,000 he withdrew from the BOA ATMs.

The State also introduced circumstantial evidence from which the jury could reasonably infer that Mr. Garcia's ATM withdrawals occurred without Ms. Macriello's consent. Ms. Macriello's brother, Roderick Mokillo, testified that Ms. Macriello did not give anyone access to her BOA accounts. The BOA records custodian testified that Ms. Macriello was the only legal signer

23

on her BOA savings account. Further, the jury heard Mr. Garcia's recorded interview with police where Mr. Garcia falsely stated both that he had (i) never taken any money from Ms. Macriello's BOA accounts, and (ii) been in Macriello's car only as a passenger. By virtue of these false exculpatory statements to the police, the jury was able to infer Mr. Garcia's consciousness of guilt for the ATM withdrawals. See Simpson v. State, 562 So. 2d 742, 745 (Fla. 1st DCA 1990).

Notwithstanding this evidence, Mr. Garcia argues that the State failed to present any evidence to prove that Mr. Garcia had the requisite specific intent either to deprive Ms. Macriello of her property or to appropriate the property to his own use. See § 812.014(1), Fla. Stat. (2013); Benitez v. State, 852 So. 2d 386, 388 (Fla. 3d DCA 2003) ("Grand theft requires proof of intent to deprive the owner of property of its use or benefit."). We disagree. "Intent, being a state of mind, is often not subject to direct proof and can only be inferred from circumstances." Benitez, 852 So. 2d at 388 (quoting Jones v. State, 192 So. 2d 285, 286 (Fla. 3d DCA 1966)). Unlike the grand theft charges premised on the checks and online transfers, Mr. Garcia's specific intent to deprive Ms. Macriello of her property can be inferred under the circumstances outlined herein. With regard to the two ATM withdrawals, we conclude, as we did in Garcia I, that the State presented sufficient evidence

24

to create a jury question as to whether Mr. Garcia had the intent either to deprive Ms. Macriello of her property or to appropriate the property to his own use.

4. <u>Mr. Garcia's theft conviction must be reduced to third-degree grand theft</u>

The State charged and indicted Mr. Garcia with second-degree grand theft, which requires that the property stolen be valued "at $20,000 or more, but less than $100,000." § 812.014(2)(b), Fla. Stat. (2013). Whereas, the charge of grand theft in the third degree requires the value of the property stolen to be between $300 and $19,999. <u>See</u> § 812.014(2)(c)1.-3., Fla. Stat. (2013). Because we conclude that the State established with competent, substantial evidence only that the two ATM transactions (totaling $1,000) constituted grand theft, Mr. Garcia's theft conviction must be reduced to third-degree grand theft. <u>See</u> § 924.34, Fla. Stat. (2013); <u>Council v. State</u>, 206 So. 3d 155, 156 (Fla. 1st DCA 2016) ("[W]e hold that the State failed to introduce competent, substantial evidence showing that the value of the stolen property exceeded $20,000, and we reverse and remand to the trial court to impose a sentence for grand theft over $10,000 but less than $20,000, a third-degree felony.").

*C. The Second-Degree Murder Conviction*

25

1. *Gustine*'s legal principle prohibiting the pyramiding of assumptions or inferences and certification of *Gustine*'s continued validity as a question of great public importance

Because it is essential to our analysis and outcome determinative, we first must address the State's principal argument on remand: that <u>Bush</u> not only eliminated the special standard, but that <u>Bush</u> also "effectively abrogated" the related legal principle – first articulated in <u>Gustine v. State</u>, 97 So. 207 (Fla. 1923) – that a criminal defendant cannot be convicted based on circumstantial evidence that requires the factfinder to engage in pyramiding of assumptions or inferences[14] to reach the conclusion that the defendant committed the essential elements of the charged crime.

In <u>Gustine</u>, the defendant, who had attempted to steal a car, was charged with attempted larceny. At trial, the State presented evidence that, although the defendant had entered the vehicle and manipulated the wires connected to the car's start switch, the defendant did not succeed in starting the car. <u>Gustine</u>, 97 So. at 208. Noting that the defendant had not successfully started the vehicle and that, to be found guilty of attempted larceny, the State was required to prove that the defendant had tried to

---

[14] "An inference is a logical deduction of fact that the trier of fact draws from existence of another fact or group of facts." <u>Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.</u>, 881 So. 2d 565, 582 (Fla. 3d DCA 2004) (quoting Charles W. Ehrhardt, <u>Florida Evidence</u> § 301.1, at 89-90 (2003)).

26

permanently – rather than temporarily – deprive the owner of the vehicle, the Florida Supreme Court stated that "[o]nly by pyramiding assumption upon assumption and intent upon intent can the conclusion necessary for conviction be reached." Id. That is, the Gustine court explained, "[i]t must be assumed, although he did not run it, that the defendant intended to run the automobile. And it must be assumed that if he had been able to run the automobile and thus deprive the owner of it, that he intended to deprive him permanently of the possession of it." Id. Such evidence, however, was "not of the conclusive nature required to sustain the verdict." Id.

The State argues that the special standard abrogated by Bush is inextricably intertwined with Gustine's prohibition against the pyramiding of assumptions or inferences, such that our high court's abolition of the former necessarily resulted in the elimination of the latter. The State notes that, prior to Bush, the Florida Supreme Court, citing to Gustine, expressly declined to eliminate the special standard, in part because "the circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences." Miller v. State, 770 So. 2d 1144, 1149 (Fla. 2000). Hence, the State argues that Bush's express elimination of the special standard invalidated Gustine's related principle prohibiting a conviction based on

27

evidence that requires the factfinder to pyramid assumptions or inferences to arrive at the conclusion of guilt.

Though Gustine and its underlying legal principle were relied upon by the Florida Supreme Court in Miller's refusal to then eliminate the special standard, we note that the Miller court characterized Gustine's legal principle as an "*addition[al]*" reason to keep the special standard, see Miller, 770 So. 2d at 1149, and not its exclusive reason. While Gustine's prohibition against the pyramiding of inferences is closely related to the special standard abolished in Bush, the two principles are not always inextricably intertwined. Indeed, in its Baugh decision, our Supreme Court concluded that Gustine's prohibition against inference pyramiding applied even where the State had presented direct evidence of the defendant's guilt.[15] Baugh, 961 So. 2d at

---

[15] The State charged Baugh with capital sexual battery on a child. Baugh, 961 So. 2d at 201. At trial, the State, under the child victim hearsay exception found in section 90.903(23) of the Florida Statutes, introduced the child's out-of-court statements to the police recounting Baugh's acts of sexual abuse. Id. at 202. Because, however, the child recanted her out-of-court statements to the police during her in-trial testimony, the State was required to provide other evidence corroborating the child's recanted statements to obtain a conviction. Id. Determining that the State's circumstantial evidence was sufficiently corroborative, the Second District affirmed Baugh's conviction, but certified a question of great public importance to the Florida Supreme Court. Id. Noting both that the child's out-of-court statements were direct evidence and that the standard of appellate review was whether the State had presented competent, substantial evidence to support the conviction, Id. at 203-204, our Supreme Court reversed Baugh's conviction, concluding that the State's circumstantial evidence was not sufficiently corroborative

28

205. We, therefore, are compelled to conclude that Gustine's legal principle – prohibiting a conviction based on the pyramiding of inferences – remains valid even after Bush eliminated the special standard.

Supporting our conclusion is the well settled axiom that the Florida Supreme Court does not overrule its own precedent *sub silentio*. See Puryear v. State, 810 So. 2d 901, 905-06 (Fla. 2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio. Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding. Where this Court's decisions create this type of disharmony within the case law, the district courts may utilize their authority to certify a question of great public importance to grant this Court jurisdiction to settle the law."). The Bush majority makes no mention of Gustine and its progeny or of the prohibition against the pyramiding of inferences.

---

because of Gustine's prohibition against the pyramiding of inferences. Id. at 205. ("Where the evidence creates only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction. Additionally, evidence is insufficient to support a conviction when it requires pyramiding of assumptions or impermissibly stacked inferences.") (citation omitted).

Our conclusion also finds support from our sister courts. The Fourth District recently reached the same conclusion in State v. Huntley, 310 So. 3d 418 (Fla. 4th DCA 2021), review denied, SC21-458, 2021 WL 3870054 (Fla. Aug. 30, 2021), a post-Bush, purely circumstantial evidence case. The Huntley court affirmed an order granting the defendant's motion for judgment of acquittal because the appellate court could not "conclude that the defendant committed an *intentional* act without impermissibly stacking inferences." Id. at 418. The last sentence of the opinion observed that "[i]n light of Bush v. State, 295 So. 3d 179 (Fla. 2020), we are aware that the jurisprudence regarding inference stacking may evolve, but at this point we are bound to follow the dictates of precedent." Id. at 419; see also Deamelio v. State, 341 So. 3d 463, 468 (Fla. 2d DCA 2022) (reversing the defendant's conviction for lewd and lascivious exhibition where the victim's testimony characterizing the defendant's actions "amounted to no more than inferences based on speculation"); Scott v. State, 330 So. 3d 562, 563 (Fla. 4th DCA 2021) (affirming the denial of a motion for judgment of acquittal because "the State put the evidence together like pieces of a puzzle, not by a stacking of inferences").

Because our resolution of Mr. Garcia's appeal hinges – and, no doubt, other Florida appellate courts' decisions will similarly hinge – on the

30

continued validity of <u>Gustine</u>'s prohibition against the pyramiding of assumptions or inferences to obtain a conviction, we certify the following question to our Supreme Court as one of great public importance:

> In light of the Florida Supreme Court's abandonment, in <u>Bush</u>, of the special standard of appellate review applied in purely circumstantial evidence cases, does <u>Gustine</u>'s legal principle – that a criminal defendant cannot be convicted based on circumstantial evidence that requires the factfinder to engage in pyramiding of assumptions or inferences to reach the conclusion that the defendant committed the essential elements of the charged crime – remain valid?

2. <u>Reconsideration of Mr. Garcia's conviction for second-degree murder on remand under the competent, substantial evidence standard of *Bush*</u>

In moving for a judgment of acquittal on the homicide charge, defense counsel argued that the State had failed to present sufficient evidence to establish (i) the fact of Ms. Macriello's death, or (ii) that Ms. Macriello had died by the criminal act of anyone, much less by Mr. Garcia's criminal actions. While the trial court denied Mr. Garcia's motion for judgment of acquittal as to the first-degree murder charge, the jury found Mr. Garcia guilty of second-degree murder, a lesser included offense. This Court, on remand, now reviews the trial evidence anew to ensure that the State presented competent, substantial evidence from which the jury, without improperly pyramiding inferences, could find beyond a reasonable doubt that Mr. Garcia was guilty of this crime. Specifically, we review the record to determine

31

whether the State established the "corpus delicti" of Mr. Garcia's second-degree murder conviction. "The corpus delicti of a homicide consists of three elements, i.e., 'first, the fact of death; second, the criminal agency of another person as the cause thereof; and third, the identity of the deceased person.'" Golden v. State, 629 So. 2d 109, 111 (Fla. 1993) (quoting Jefferson v. State, 128 So. 2d 132, 135 (Fla. 1961)).

As explained below, we conclude that: (i) the State presented competent, substantial evidence from which the jury could find that Ms. Macriello was dead; but (ii) the State's evidence was insufficient to establish that Ms. Macriello's death was due to the specific criminal agency of Mr. Garcia.

*a. The State's proof that Ms. Macriello died*

Though Ms. Macriello's body was never found, the State could prove the fact of her death through circumstantial evidence. See Crain v. State, 894 So. 2d 59, 72 (Fla. 2004). "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist." Baugh, 961 So. 2d at 203 n.5 (quoting Davis v. State, 90 So. 2d 629, 631 (Fla. 1956)).

Coupled with a person's unexplained disappearance, circumstantial evidence from which the factfinder can infer that a missing person has died

includes an abrupt change in the person's habits, the personal property the person has left behind, and the person's lack of communication with friends and family members. See Meyers v. State, 704 So. 2d 1368, 1370 (Fla. 1997); Thomas v. State, 693 So. 2d 951, 952 (Fla. 1997). Based on the circumstantial evidence presented below showing the abrupt changes in Ms. Macriello's normal behavior, the belongings she left behind, and her lack of communication with her family after she was last seen, we agree with the State that it presented sufficient evidence from which the jury, without improperly pyramiding inferences, could infer beyond a reasonable doubt that Ms. Macriello had died.[16]

### b. The State's proof that Mr. Garcia's criminal acts caused Ms. Macriello's death

Our chief concerns with whether the State presented sufficient evidence that Ms. Macriello died by Mr. Garcia's criminal acts are that (i) the State's entire case rests on the foundational assumption that Ms. Macriello died on June 4, 2013, and (ii) the State's circumstantial evidence required

---

[16] We note that Mr. Garcia's Supplemental Answer Brief on Remand does not take issue with this Court's comment, repeated throughout Garcia I, that Ms. Macriello's death was "apparent" from the record. Garcia I, 276 So. 2d at 871-74. Nor does Mr. Garcia's supplemental briefing make any argument with respect to whether the State presented competent, substantial evidence below that Ms. Macriello had died.

the jury to pyramid inferences on top of this foundational, date-of-death assumption. Before we address the pyramiding of inferences required for the jury to conclude that Ms. Macriello's death was caused by Mr. Garcia's criminal acts, though, we address the State's argument that such inference pyramiding was permissible here because the "established fact" exception allows the pyramiding of inferences in this case.[17]

(i)    The "established fact" exception to _Gustine_'s prohibition against the pyramiding of inferences

The State urges this Court to adopt the "established fact" exception to the general rule prohibiting the pyramiding of inferences that is commonly applied in the civil context. In civil cases, "when no contrary _reasonable_ inference may be indulged, such inference is elevated for the purpose of further inference to the dignity of an established fact." Voelker v. Combined Ins. Co. of Am., 73 So. 2d 403, 407 (Fla. 1954). That is to say that, in a civil case, "[i]nferences may be pyramided only if the initial inference is established to the exclusion of any other reasonable theory." Hurst v. Astudillo, 631 So. 2d 380, 381 (Fla. 3d DCA 1994).

---

[17] This is a secondary argument of the State. As discussed in section III. C. 1., _supra_, the State's principal argument is that Gustine's prohibition against inference pyramiding was impliedly abrogated by Bush.

The First and Second Districts have adopted and applied in criminal cases this exception to the general rule against the pyramiding of inferences. See Keys v. State, 606 So. 2d 669, 673 (Fla. 1st DCA 1992) (adopting an exception to the prohibition against the pyramiding of inferences to arrive at a conclusion of guilt, explaining that "if no reasonable inference contrary to the base inference may be indulged, the base inference may be elevated to the dignity of an established fact for the purpose of drawing further inferences"); Benson v. State, 526 So. 2d 948, 953 (Fla. 2d DCA 1988) (adopting the established fact exception in criminal cases, explaining that a secondary "inference may be admissible into evidence, even though it is based upon another inference, if the other inference has been shown to exist beyond a reasonable doubt").

(ii) The State's argument that the June 4, 2013 date-of-death assumption should be elevated to an "established fact"

In this case, the State claims that the only reasonable inference the jury could reach below was that Ms. Macriello died on June 4, 2013, and, therefore, that such inference should be elevated to an established fact. Hence, according to the State, additional inferences drawn by the jury from this date-of-death assumption are not violative of Gustine's general rule prohibiting the pyramiding of inferences.

Plainly, a jury certainly *could* reasonably infer from the evidence below that Ms. Macriello died on June 4, 2013. But even if we were to adopt the "established fact" exception, we disagree with the State's assertion that the *only* reasonable inference to be drawn from the evidence is that Ms. Macriello died on June 4, 2013. Ms. Macriello's body was never found to pinpoint a time of death. There was no crime scene or other evidence to establish the location, time, cause or manner of Ms. Macriello's death. There were no eyewitnesses to any crime, and Mr. Garcia did not confess to killing Ms. Macriello. Indeed, it could just as easily be reasonably inferred that Ms. Macriello was still alive after June 4, 2013, based on: (i) evidence that Ms. Macriello's cellphone made outgoing calls after June 4, 2013; (ii) evidence that Mr. Garcia's cellphone received a call from Ms. Macriello's second cellphone after June 4, 2013, coupled with the police's failure to secure the cellphone records for Ms. Macriello's second cellphone; and (iii) the numerous BOA account transactions occurring after June 4, 2013.

Even in jurisdictions where the "established fact" exception has been adopted, for the exception to apply – such that inferences may be pyramided upon the "established fact" inference – the evidence must establish, beyond any reasonable doubt, that *no other* inference is reasonable. Keys, 606 So. 2d at 674 ("[T]he trial court's flight instruction erroneously elevated the base

36

inference, from which the jury was to draw the ultimate inference of guilt, to the dignity of an established fact notwithstanding other reasonable inferences permissible under the circumstances proven in this record, resulting in the impermissible pyramiding of inferences."); Benson, 526 So. 2d at 953 ("[T]he evidence in its totality supports no contrary reasonable inference. Under these circumstances the reason for the general rule against the pyramiding of inferences – to avoid judgments based upon speculation – does not exist.") (citation omitted).

Because other date-of-death inferences can reasonably be drawn from the evidence, we disagree with the State that its foundational June 4, 2013 date-of-death assumption was elevated to the dignity of an established fact such that other inferences may be permissibly pyramided upon it to draw the ultimate inference of guilt.[18]

(iii)   The jury could not find that Mr. Garcia's criminal acts caused Ms. Macriello's death without impermissibly pyramiding inferences on the foundational date-of-death assumption

We now explain why the jury could not reach the conclusion that Ms. Macriello's death was caused by Mr. Garcia's criminal acts without

---

[18] For this reason, we need not, and do not, decide whether to join our sister courts in adopting, for criminal cases, the "established fact" exception to Gustine's general rule against the pyramiding of inferences.

impermissibly pyramiding inferences on the foundational assumption that Ms. Macriello died on June 4, 2013.

"An impermissible pyramiding of inferences occurs where at least two inferences in regard to the existence of a criminal act must be drawn from the evidence and then stacked to prove the crime charged; in that scenario, it is said that the evidence lacks the conclusive nature to support a conviction." Kennedy v. State, 781 So. 3d 421, 423 (Fla. 4th DCA 2001) (quoting Graham v. State, 748 So. 2d 1071, 1072 (Fla. 4th DCA 1999)). While, under Gustine, a criminal conviction premised upon such pyramiding of inferences is prohibited, where the State's circumstantial evidence is not pyramided, but can be "put . . . together like pieces of a puzzle," such evidence does not run afoul of Gustine, and is sufficient for the jury to arrive at the conclusion of guilt. Scott, 330 So. 3d at 563; State v. Sephes, 262 So. 3d 811, 817 (Fla. 4th DCA 2019). Unsurprisingly, Mr. Garcia argues that the jury could not have found him guilty of Ms. Macriello's murder without the prohibited pyramiding of inferences, whereas the State argues the jury merely put the evidence together like pieces in a puzzle, without any inference pyramiding.

*(1) The State's theory requires pyramiding of inferences*

The State posited below that Mr. Garcia killed Ms. Macriello on June 4, 2013, and that he then took steps to make it appear that she was still alive so that he could steal the money from her BOA accounts. The State argues that the jury, without resorting to the pyramiding of inferences or assumptions, was capable of linking the numerous pieces of circumstantial evidence presented at trial together like a puzzle to reveal the full picture: i.e., that Ms. Macriello died by a criminal act of Mr. Garcia. The State's case against Mr. Garcia, though, was missing significant pieces of evidence that required the jury to resort to sheer conjecture and speculation in order to fill in the major gaps in the State's theory that Mr. Garcia's alleged criminal conduct caused Ms. Macriello's death.

To wit, Ms. Macriello's body was never found to establish a time of death, and there was no crime scene or other evidence to establish the location, cause or manner of Ms. Macriello's death. There was no murder weapon, no eyewitness to a murder, and Mr. Garcia made no confession to Ms. Macriello's murder. Despite this missing evidence, the State invited the jury to draw the following chronological inferences from the circumstantial evidence, and to then pyramid these inferences atop the base assumption that Ms. Macriello died on June 4, 2013, in order to arrive at the conclusion that she died through the criminal agency of Mr. Garcia:

- Prior to June 4, 2013, Mr. Garcia either forged or coerced Ms. Macriello to write him (i) two $20,000 checks that were post-dated to June 5, 2013, and June 10, 2013, and (ii) a $20,000 promissory note evidencing that Mr. Garcia made a personal loan to Ms. Macriello.

- On June 4, 2013, Mr. Garcia killed Ms. Macriello – possibly with the "hammer" outlined by the luminol in the interior of Ms. Macriello's car – and then used her vehicle to discard of the "hammer," her "purse" (also outlined by the luminol), and possibly her body.

- After using Ms. Macriello's vehicle to make the drive-up ATM withdrawal from Ms. Macriello's BOA savings account on June 5, 2013, Mr. Garcia – sometime between June 5, 2013 and June 10, 2013 – took the car to have it cleaned to remove the blood left in the car, to hide the car's complicity in Ms. Macriello's murder, and to cover up for Mr. Garcia's use of the vehicle after he killed her.

- On June 10, 2013, Mr. Garcia dropped off Ms. Macriello's vehicle outside her apartment building to give the impression that she was alive and well at home.

- Mr. Garcia took Ms. Macriello's cellphone after he killed her, kept her cellphone active, and used it to make phone calls until July 7, 2013, all to give the impression to others that she was still alive.

- Between June 5, 2013 and August 15, 2013, Mr. Garcia slowly and methodically stole the funds from Ms. Macriello's BOA accounts.

Further, in order to accept the State's theory of events, the jury was required to pyramid additional inferences upon these chronological inferences. For example, in order to infer that Mr. Garcia used Ms. Macriello's car to accomplish or to hide the fact of the murder, the jury was required to

40

infer that: (i) Mr. Garcia killed Ms. Macriello on June 4, 2013; (ii) the liquid the luminol reacted to when CSI processed the car was blood; (iii) the "blood" on Ms. Macriello's "purse" and the "hammer" belonged to Ms. Macriello; and (iv) Mr. Garcia had the vehicle cleaned to remove the "blood" and other evidence of the murder, and to hide his use of the vehicle after the murder. Similarly, to infer that Mr. Garcia used Ms. Macriello's cellphone to cover up the murder, the jury was required to infer that Mr. Garcia: (i) killed Ms. Macriello on June 4, 2013; (ii) took Ms. Macriello's cellphone and kept it; and (iii) placed numerous calls between Ms. Macriello's cellphone and his cellphone, while both phones were on his person.

Not only was the jury required to pyramid inferences to accept the State's chronology, but many of the underlying inferences were not supported by any competent, substantial evidence. The State failed to establish that Mr. Garcia committed theft by depositing the two $20,000 personal checks into his BOA checking account, or by receiving the $4,700 in online transfers to his BOA checking account, undercutting the State's posited motive for Mr. Garcia to commit murder. No actual blood was found in Ms. Macriello's car. No murder weapon was ever identified or recovered. Her purse was never located. Nor was any evidence introduced at trial describing the size and shape of her purse. Hence, the conclusions that the

41

State asked the jury to infer – i.e., that the objects outlined by the luminol in Ms. Macriello's car were the murder weapon and Ms. Macriello's purse – are purely speculative.

And we find it significant that the police never received the cellphone records for Ms. Macriello's second cellphone number that she had obtained in late May 2013, just days before her disappearance. Mr. Garcia's cellphone records, though, reflected an incoming call from Ms. Macriello's second cellphone number on June 7, 2013, several days after the State theorizes that Mr. Garcia killed her.

Aside from the impermissible pyramiding of inferences drawn from the circumstantial evidence discussed herein, the State presented no other evidence at trial connecting Mr. Garcia to Ms. Macriello's death. Because the trial evidence was insufficient to establish that Ms. Macriello died by a criminal act of Mr. Garcia, we are compelled to reverse Mr. Garcia's conviction for second-degree murder.

(2) *Mr. Garcia's inconsistent and untruthful statements to the police*

Finally, we address the State's argument that Mr. Garcia's false statements to the police constitute substantive evidence of Mr. Garcia's "consciousness of guilt" for Ms. Macriello's murder. Certainly, a defendant's false exculpatory statements made to the police to avoid prosecution for a

crime constitute "substantive evidence tending to affirmatively show a consciousness of guilt on [the defendant's] part" for committing *that* crime. Simpson, 562 So. 2d at 745 (recognizing that the wife's false exculpatory statement to the police that her ex-husband had shot her husband was admissible as substantive evidence that the wife was the actual shooter); see also United States v. Holbert, 578 F. 2d 128, 129-30 (5th Cir. 1978) (concluding that Holbert's false exculpatory statement to the police "explaining his presence at the scene of the crime" – i.e., a trailer with a broken seal that contained a shipment of carpet – was admissible as substantive evidence to prove Holbert's guilt for breaking the seal on the trailer and conspiring to steal its contents). The question here is: to what extent do Mr. Garcia's inconsistent and untruthful statements during the course of the police investigation constitute substantive evidence of his consciousness of guilt for killing Ms. Macriello?

That Mr. Garcia lied about never driving Ms. Macriello's car, and that he gave inconsistent stories about how he obtained the money from Ms. Macriello is surely substantive evidence of Mr. Garcia's consciousness of guilt for committing theft of her car (which was not charged) and theft of her

money.[19] Lacking, however, is any evidence providing a sufficient nexus between the substance of Mr. Garcia's false exculpatory statements and the homicide of Ms. Macriello. As the Florida Supreme Court has observed, whether a defendant's conduct shows consciousness of guilt in a particular case depends on whether there is "evidence that would allow the jury to reasonably infer that the defendant was attempting to avoid prosecution *for the offense on trial*." Partin v. State, 82 So. 3d 31, 38 (Fla. 2011); see Adderly v. State, 44 So. 3d 167, 171 (Fla. 4th DCA 2010) (concluding that the trial court erred by "permitting the state to argue to the jury that it could infer that Appellant's giving of a false name and running from the officer [four months after the crimes occurred] was evidence of his consciousness of guilt of *the offenses for which he was on trial*") (emphasis added).

Mr. Garcia's false exculpatory statements to the police are pieces of circumstantial evidence, see Holbert, 578 F. 2d at 130, that are subject to Gustine's prohibition against the pyramiding of inferences. We conclude that Mr. Garcia's false exculpatory statements have the same failings as the other circumstantial evidence presented by the State at trial. That is, without any evidence providing a sufficient nexus between Mr. Garcia's false exculpatory

---

[19] See our application of this "consciousness of guilt" inference with regard to the ATM withdrawals in section III. B. 3., *supra*.

statements and the homicide charge, only by the pyramiding of inferences could the jury arrive at the conclusion that Mr. Garcia's false exculpatory statements showed his consciousness of guilt for killing Ms. Macriello.

## IV. CONCLUSION

On remand from the Florida Supreme Court, we again conclude that the State presented competent, substantial evidence from which the jury could find Mr. Garcia guilty of grand theft beyond a reasonable doubt for the two $500 ATM withdrawals. The State failed, however, to present competent, substantial evidence that Mr. Garcia committed theft by either: (i) depositing the two $20,000 personal checks into his BOA checking account; or (ii) receiving the $4,700 in funds through a series of online transfers from Ms. Macriello's BOA checking account. Because the value of the property stolen is $1,000, we reduce Mr. Garcia's conviction for second-degree grand theft to third-degree grand theft and remand for resentencing. See § 924.34, Fla. Stat. (2013); § 812.014(2)(c)1., Fla. Stat. (2013).

Because the State failed to present competent, substantial evidence from which the jury – without resorting to the pyramiding of assumptions or inferences – could infer, beyond a reasonable doubt, Mr. Garcia's guilt for second-degree murder, we reverse Mr. Garcia's second-degree murder

conviction and remand this case to the trial court with directions to enter a judgment of acquittal on the homicide charge.

We also certify the following question of great public importance to the Florida Supreme Court:

> In light of the Florida Supreme Court's abandonment, in Bush, of the special standard of appellate review applied in purely circumstantial evidence cases, does Gustine's legal principle – that a criminal defendant cannot be convicted based on circumstantial evidence that requires the factfinder to engage in pyramiding of assumptions or inferences to reach the conclusion that the defendant committed the essential elements of the charged crime – remain valid?

Affirmed in part, reversed in part, and remanded with instructions; question certified.